**NICHOLS et al.**

**v.**

**SECURITIES AND EXCHANGE COMMISSION et al.**

**No. 162, Docket No. 22873.**

United States Court of Appeals, Second Circuit.

Argued Feb. 8, 1954.

Decided March 12, 1954.

Rehearing Denied April 7, 1954.

Harold G. Aron, New York City, pro se.

Alexander Chananau, New York City, for Nichols et al., appellants.

William H. Timbers, Gen. Counsel, S. E. C., Myron S. Isaacs, Assoc. Gen. Counsel, Solomon Freedman, Spec. Counsel, Washington, D. C., for the Securities and Exchange Commission.

David K. Kadane, Mineola, N. Y. (Charles R. Pierce, Mineola, N. Y., of Counsel), for Long Island Lighting Co.

Before CHASE, Chief Judge, and L. HAND, Circuit Judge, and DIMOCK, District Judge.

L. HAND, Circuit Judge.

These are appeals from an order of Judge Inch, "enforcing" allowances for services and expenses in a proceeding

before the Securities & Exchange Commission under § 11(e) of the Public Utility Holding Company Act of 1935. The appellants are (1) the "Committee": i. e. a committee of common shareholders of the Long Island Lighting Co.; the "Old Company"; (2) Harold G. Aron, one of the "Committee's" counsel; (3) Ennis M. Nichols, a member of the "Committee"; and (4) Robert G. Knott, its treasurer. The "Committee's" appeal concerns only its disbursements; the other appeals deal with allowances for services. It will be most convenient first to take up the appeal of Mr. Aron from his allowance of $7500 for legal services, to an understanding of which some statement of the facts is necessary.

On March 27, 1936, the S. E. C. granted an "exemption" to the "Old Company" and its subsidiaries under § 3(a) (1) of the Act, and on December 16, 1944, that company filed a "certificate" for the reduction of its capital stock with the Secretary of State of New York. This had had the approval of the N. Y. Public Service Commission, and gave a substantial percentage of common shares to the common shareholders of the "Old Company." The S. E. C. tried unsuccessfully to enjoin any distribution of the new shares, but did get a stay, pending an appeal to the Supreme Court; and before this came on to be heard, the S. E. C. on April 21, 1945 revoked the "exemption." The "Old Company" filed a new plan with the S. E. C. on October 25, 1945, awarding 5.19% of the common shares in the "New Company" to the old common shareholders. Both the New York Commission and the S. E. C. conducted hearings on this plan, and on September 24, 1947 the New York Commission issued a "memorandum," declaring that it would not approve any plan that gave any share interest to the old common shareholders. In consequence of this on March 10, 1948 the "Old Company" filed an amended plan under § 11 (e), substituting for any share interest in the "New Company" an allowance of 35 cents a share. Thereafter and on June 10, 1948, the S. E. C. allowed the "Committee," which had meanwhile been formed, to intervene in the proceeding before it; and after hearings in which Mr. Aron and his colleagues, Warren & McGroddy, took part, the S. E. C. on November 16, 1949, approved the 1948 plan with modifications, one of which was to distribute 5.71% of the common shares of the "New Company" to the old shareholders, in place of 35 cents a share. This substitution has proved exceedingly profitable to the old shareholders, and Mr. Aron bases his claim for an allowance in substantial part upon it, for he insists that he was instrumental in bringing about the change.

Moreover, his other activities were extensive; at one time he succeeded in getting the New York legislature to amend the state law by changing the basis for computing the value of public service companies, although the bill was vetoed by the governor. His purpose in this was that he might thereby persuade the New York Commission to change its earlier ruling, and to grant a share interest in the "New Company" to the old shareholders; and he hoped that the S. E. C. would thereupon follow suit, although we had already held that its power was paramount in reorganizations under § 11(e), and the Supreme Court had denied certiorari.[1] He gave considerable time to interviews with bankers, whom he sought to interest in the "Old Company" in the expectation that the shareholders might displace the existing management and withdraw the plan. Should that happen, he knew that financial help would be necessary to refund the company's floating indebtedness. He opposed what he regarded as the obviously inadequate bid of the Consolidated Edison Company of New York for all the property of the "Old Company." This had been made on the assumption that such a transfer should not affect the exemption of the bidder from the

1. Public Service Commission v. Securities & Exchange Commission, 2 Cir., 166 F.2d 784.

S. E. C.,—a matter on which the Commission apparently never took any position—; but the bid was withdrawn after about eighteen months. He appealed to the Court of Appeals for the District of Columbia from an order of the S. E. C. denying him leave to solicit a contribution of five cents a share from the common shareholders for the expenses of the "Committee." He spent considerable time in public agitation on behalf of the shareholders through articles in the press. He attended meetings of the "Committee" and most of the S. E. C. hearings upon the plan. Altogether he estimated that he spent between 1500 and 2000 hours upon the work during the three years he was engaged in it; and down to the present time he has consistently urged in many ways that the common shareholders had been, and continued to be, defrauded by the management of the "Old Company." He has always challenged the jurisdiction of the S. E. C. on the ground that the "Old Company" was purely intrastate, and on the further ground that the shareholders had acquired vested rights under the original plan of 1944. The foregoing is not a complete account of all his activities; but it includes the most important ones.

The S. E. C. concluded that his efforts had not "contributed to any material extent to the development of the plan, or resulted in any substantial benefit to the common stockholders." This conclusion followed a detailed consideration too long to quote, and was based upon findings of fact that we are asked to reverse because they have no substantial support in the record. The most important of his putative contributions to the shareholders is the change from 35 cents a share to a share interest. However, we should have no warrant for holding that it was to any substantial degree because of Mr. Aron's intervention that this was made; for the S. E. C. declared that it was because they thought it undesirable to impose a fixed charge upon the "New Company" at the outset, and that an interest, contingent upon the success of the venture, was to be preferred. Obviously, we may not say that the Commission did not know what moved it to make the change; or that its declaration was false that Mr. Aron had not contributed "any substantial benefit to the common shareholders." It is true that this does not mean that he should get nothing for his services; but it greatly circumscribes the amount.

It is of course not true that, upon an appeal from the Commission's appraisal of an attorney's professional services, we are without power to reverse its ruling; but the conditions upon the exercise of the power require great reserve in its use. We need cite no more than what we very recently said at the conclusion of our opinion in In re Electric Power & Light Corporation, 210 F. 2d 585: "As the Commission has had the advantage of intimate knowledge of the whole proceedings, which is an invaluable guide in determining the value of services and the reasonable need for the incurrence of expenses, its findings, though not conclusive, should be given much weight." Such appraisals are at best beset with much uncertainty, not only because of the number of factors involved, but of the absence of any quantitative tests; and it is only in rare instances that the "great weight" of an unbiased allowance should not be taken as preponderant. In the case at bar all the claims are limited to services rendered after June, 1948, when the "Committee" was allowed to intervene; and by that time we had decided that the S. E. C. was paramount, and the Supreme Court had refused to intervene. We may of course have been mistaken; but it should have appeared to Mr. Aron to the last degree unlikely that our ruling would not remain authoritative. We cannot, therefore, accept as compensable any efforts directed towards the possibility that the case would not have to be worked out in the pending proceeding. The "Committee" was of course free to protect its interests before the Commission; but it was certainly proper in measuring the allowances, not only to

disregard the futile efforts to avoid the jurisdiction of the S. E. C., but also, as we have already said, to treat as unsubstantial, any contribution to the change in the shareholders' interest. These services being eliminated, it seems to us that the overall award of $27,500 to the "Committee's" counsel was clearly within unassailable limits; and Mr. Aron does not seek any redistribution of this, if it is the total. The order will therefore be affirmed subject to a possible modification that appears at the end of this opinion.

To Nichols and Knott the Commission refused to make any allowances whatever, although each—one, as a member of the "Committee," and the other, as its treasurer—performed services of value. The Commission's reason for its refusal was its Rule U62(g) which we quote in the margin.[2] Neither Nichols, nor Knott, had himself bought or sold any shares in the "Old Company" or the "New"; but Nichols's wife bought 200 shares in April 1949 and sold 300 in November; and his daughter sold 2150 in November 1949; and Knott's sister bought 4000 shares in 1949 and 1950. Nichols swore that he had no knowledge of the transactions of either his wife or daughter; and, although Knott did not testify at the hearings, on February 14, 1951, almost two years before the report was filed, he had filed his application for compensation, in which he said that his "sister bought 4000 shares in 1949 and 1950, in which purchases I have not at any time had any pecuniary interest or otherwise, direct or indirect." This he followed on July 29, 1952, by a letter to the S. E. C. stating: "I had no knowledge of my sister's purchase of stock in the Long Island Lighting Company; I had no interest direct or indirect therein and I had no control over my sister's action. My sister, who is a woman of middle age, manages her own affairs and asks no advice of me." He had had no intimation that these statements would not be deemed adequate; and the most elemental considerations of justice compel us to assume that, like Nichols, he knew nothing of his sister's dealings, and that he had no beneficial interest in them.

The Commission held that, "even assuming such lack of knowledge, * * * under the circumstances here presented such trading operates as a bar to the allowance of compensation. * * * the clear intendment of Rule U62 is that trading by members of the immediate family of any person connected with the committee falls in the category of prohibited trading by that person except perhaps in unusual circumstances which have not been shown to exist here. * * * Any other practice could lead to widespread abuse by applicants who sought to circumvent the trading prohibition to a fictitious separation of actions and interests of the family members." Except for the nebulous suggestion of a possible escape "in unusual circumstances," not specified, this is a revival of the unitary liability of the archaic sib; and it is a gloss upon the language that it will not bear. In modern times a man's wife is independent economically, and her profits are as a little his as are his neighbors'. Moreover, the gloss was not even confined to wives, which might be at least under-

2. Rule U–62(g) (2) provides:

"No securities of the company or companies in reorganization, or of any subsidiary of such company, or of any other associate company thereof which may be affected by the reorganization, shall be bought or sold by or for the account of (whether as principal, agent, trustee, or otherwise) any of the persons specified in clauses (A) to (E) below, or in any transaction in which any such person has any beneficial interest, direct or indirect; nor shall any investment advice with respect to any such securities be given, directly or indirectly, by—

"(A) Any person who makes any solicitation subject to this rule; or

"(B) Any person connected with any committee or other organization formed to act under the authorization so solicited; or

\*　　\*　　\*　　\*　　\*

"(E) Any person who is a partner or employer or any person specified in (A) or (B) above."

standable; but included the "immediate family," whatever that may mean. We do not of course question that such transactions may often be the cover for concealed evasions of the Rules; and we agree that the Commission has power by rule to prevent them. For example, a rule might put the burden upon an applicant in such cases to show that he had no beneficial interest in the dealings of his wife, or daughter or sister, or any other specified persons. But the gloss is nothing of the sort; it is an unconditional forfeiture of the applicant's earnings by transactions of which he may in fact have never had the least intimation, and moreover these may be the transactions of persons whose identity is left undetermined. We do not forget the Commission's attempt to soften the harshness of this result by the concluding placebo: "we do not think that an automatic bar to compensation should be applied where there has been trading by a person whose relationship * * * is that of a close, rather than an immediate relative"; but certainly that is no guide, and merely reserves an unascertainable discretion that may temper the wind to the shorn lamb, if the Commission be so minded. We will go further; it is at least conceivable that a rule might be valid, that forfeited a member's or an attorney's allowance, if the dealings of named persons had taken place without his knowledge and without any proved benefit to him. There are transactions, in which the evidence of wrongdoing is so inaccessible, that they may be absolutely banned. However, forfeitures are never implied; and if more than a burden of proving innocence is to be imposed, at least the rule must expressly advise the applicant of his risk in advance and declare whose dealings shall have that effect.

The S. E. C. seeks to support its gloss by the interpretation of § 249 of the Bankruptcy Act, 11 U.S.C.A. § 649, which contains the same language: "beneficial interest, direct or indirect". We considered this section in Berner v. Equitable Office Building Corporation, 2 Cir., 175 F.2d 218, 221, where the question was whether an attorney for shareholders had forfeited his allowance because upon his " 'advice and consultation' " his brother-in-law had dealt in the securities of the company. We held, 175 F.2d at page 221, that "the trustee and the S. E. C. had the burden of proving that Berner" (the attorney) "did acquire an interest in Bell's" (the brother-in-law) "shares; and that, since they did not succeed in doing so, § 249 does not forfeit Berner's claim to all compensation." Nevertheless, we went on to hold that the attorney's "advice" to his brother-in-law was a breach of his duty as a fiduciary; and that the bankruptcy court as a court of equity should consider how far this should count in fixing his allowance; indeed, we even left open the question whether it might not "justify a total disallowance as matter of discretion". 175 F.2d at p. 222. On the other hand, apparently when In re Midland United Co. was in the district court, 64 F.Supp. 399, 416, Judge Biggs meant to go as far as the Commission had gone here; and Judge Ford followed him in In re Inland Gas Corp., D.C., 73 F.Supp. 785, 791. However, when the Third Circuit unanimously affirmed Judge Biggs, 159 F.2d 340, the majority did so because the applicant's wife dealt in the securities with his "entire approval and knowledge"; and Judge Goodrich dissented even as to this, and concurred only because the applicant had himself dealt in the securities of a subsidiary. Judge Kirkpatrick either read the section as we did in Berner v. Equitable Office Building Corporation, supra, 175 F.2d 218; or at any rate held that the fiduciary must be shown to have known of the dealings of his relation or connection.[3] Judge Sweeney has very recently held[4] that Rule U62(g) does not forfeit the allowance of an applicant

---

**3.** In re Philadelphia & Reading Coal & Iron Co., D.C., 61 F.Supp. 120, 128; In re Philadelphia & Western Ry. Co., D.C., 64 F.Supp. 738, 741.

**4.** In re Eastern Gas & Fuel Associates, D.C., 120 F.Supp. 460.

**418**

whose wife deals in the securities, even with his knowledge and although profits go to her account. We conclude that, although not all the decisions are in entire accord with the construction we put upon § 249 in Berner v. Equitable Office Building Corporation, supra, there is very little authority for holding that § 249 applies when the fiduciary is ignorant of his relative's dealings. In any event we shall adhere to our own interpretation, unless the Supreme Court rules otherwise; and it follows that so much of the order as denied the allowances will be reversed.

■ There remains the question of the "Committees" expenses. The challenged items were four, aggregating $2,300.16, which we will take up seriatim. The first is a balance of $650 out of a total of $2150 that the "Committee" paid Mr. Aron for his services. The S. E. C. allowed $1500, but denied the balance, because he had not kept any detailed record of what he spent, or for what purposes he spent it: he could say no more than that he was sure that he had spent all he claimed in the interest of the "Committee's" affairs. The situation falls within the principle, first laid down in Cohan v. Commissioner of Internal Revenue, 2 Cir., 39 F.2d 540 [5]: i.e., when a taxpayer proves that he is entitled to some deduction, but, because he has failed to keep accurate accounts, he cannot tell exactly how much it should be, it is an error to deny him any deduction whatever, and the Commissioner must allow at least an irreducible minimum. The Supreme Court recognized this principle in Helvering v. Taylor, 293 U.S. 507, 515, 516, 55 S.Ct. 287, 79 L.Ed. 623, and applied it in a slightly different setting. The S. E. C. also recognized it in the case at bar, and gave Mr. Aron what in the circumstances we can only regard as a most generous allowance.

■ The second item is the payment of $75.90 to a Washington attorney in aid of the "Committee's" appeal from the order of the S. E. C., denying it leave to solicit the shareholders for a contribution of five cents a share towards the expenses of the proceeding. It is true that the Court of Appeals of the District of Columbia affirmed the ruling as being within the Commission's powers; but the vote was two to one, and we must treat the question as not free from doubt; moreover, it was pertinent to the "Committee's" conduct of its business, because if the ruling had been the other way, it might well have collected enough money to defray its expenses. It appears to us therefore that the appeal was reasonable, and the fact that it was unsuccessful does not make the expense an improper charge against the corporation.[6] It should have been allowed. The S. E. C. declared that Mr. "Aron's services in connection with these matters" (one of which was "the proceedings relating to the committee's request to solicit contributions") "do not represent any contribution to the development of the plan or the proceedings." It follows from what we have just said that the appeal from the order denying leave to solicit should not be deemed wholly uncontributive to "the proceedings." We can scarcely suppose that a reappraisal, which will include these services, will result in any substantial increase; but it would not be consistent to allow the expense and to deny him the right to apply for whatever added amount may be awarded on their account.

5. Cohan v. Commissioner of Internal Revenue, 2 Cir., 39 F.2d 540; Isbell Porter Co. v. Commissioner of Internal Revenue, 2 Cir., 40 F.2d 432; Conrad & Co. v. Commissioner of Internal Revenue, 1 Cir., 50 F.2d 576; Sioux City Stock Yards Co. v. Commissioner of Internal Revenue, 8 Cir., 59 F.2d 944; Davison v. Commissioner of Internal Revenue, 2 Cir., 60 F.2d 50; B. F. Sturtevant Co. v. Commissioner of Internal Revenue, 1 Cir., 75 F.2d 316; Bryant v. Commissioner of Internal Revenue, 2 Cir., 76 F.2d 103; Miller v. Commissioner of Internal Revenue, 2 Cir., 150 F.2d 823; Boston & Maine R. R. v. Commissioner of Internal Revenue, 1 Cir., 206 F.2d 617, 624 note 6.

6. In re Engineers Public Service Co., D. C., 116 F.Supp. 930, 936.

The third item is $605.90 interest paid by the "Committee" for money borrowed from banks to disburse its expenses during the proceeding. The only evidence of how this money was used is in a letter from the chairman of the "Committee" to the secretary of the S. E. C., which merely gave the names of the payees of the cheques drawn upon the deposits. On their face, some of these were not payments for allowable expenses, and none are self-explanatory. We do not mean to hold that interest on money borrowed by a "Committee" can never be an allowable expense; but, in order to make it so, more should be shown than appeared here.

The last item is $968.36, paid to an advertising agency, the only explanation of, or justification for, which we can find in the record is the testimony of Mr. Aron, as follows: "we had occasion to correct misstatements that were occurring in the newspapers. I think we sent out probably four or five pieces of publicity in order to make the position of our committee clear." Again, "where our position was misrepresented we stated what our position was. We suffered a great deal of misrepresentation because, as I say, the Long Island Company has always had an extremely good press." This can only be read as meaning that the expense was for propaganda in favor of the "Committee's" contest with the "Old Company." Again, we do not say that it would have been beyond the power of the S. E. C. to allow such an expense,—though it is indeed somewhat difficult to find an excuse for it—; but it needs no discussion to show that at best it lay within the Commission's discretion to disallow it.

The order will be affirmed except as to the following matters:

(1) Mr. Aron may, if so advised, apply to the S. E. C. for an added allowance based upon his services on the appeal from the order denying the "Committee" leave to solicit.

(2) The order denying any allowance to Nichols and Knott will be reversed, and the proceeding will be remanded to the S. E. C. to make suitable allowances.

(3) The payment of $75.90 will be allowed as an expense to the "Committee."

On Petition for Rehearing.

PER CURIAM.

Petition for rehearing denied. We cannot find that the receipted bills and copies of advertisements now offered as a basis for a modification of our decision were in evidence before the Commission. Our affirmance of the Commission's order shall not, however, bar an application to it by the Shareholders Committee for a rehearing of the denial of the items in question.