286 F.2d 786
 Isadore BLAU, a stockholder of Tide Water Associated Oil
Company, suing on behalf of himself and all other
stockholders similarly situated and on behalf of and in the
right of Tide Water Associated Oil Company,
Plaintiff-Appellant-Appellee,
v.
Robert LEHMAN, Allan S. Lehman, John Hertz, John M. Hancock,
Monroe C. Gutman, Paul M. Mazur, William J. Hammerslough,
Francis A. Callery, Frederick L. Ehrman, John R. Fell,
William S. Glazier, Philip H. Isles, Herman H. Kahn, Edwin
L. Kennedy, Frank J. Manheim, Paul E. Manheim, Morris
Natelson, Harold J. Szold and Joseph A. Thomas, a
co-partnership, doing business under the firm name and style
of Lehman Brothers, Defendants-Appellees, Joseph A. Thomas,
Defendant-Appellee-Appellant, and Tide Water Associated Oil
Company, Defendant-Appellee.
 No. 51, Docket 25846.
 United States Court of Appeals Second Circuit.
 Argued Nov. 1, 1960.
Decided Dec. 20, 1961, Rehearing Denied in Banc. Feb. 21, 1961.
 
 Morris J. Levy, New York City, for plaintiff-appellant-appellee.
 Cyrus R. Vance, New York City (Robert S. Carlson and Simpson Thacher & Bartlett, New York City, on the brief), for defendants-appellees (other than Tide Water Associated Oil Company) and Joseph A. Thomas, defendant-appellee-appellant.
 Walter P. North, Gen. Counsel, Securities & Exchange Commission, Washington, D.C., for Securities and Exchange Commission.
 Before SWAN, CLARK and MEDINA, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 In this action by a stockholder of Tide Water Associated Oil Company brought under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. 78p(b),[1] to recover on Tide Water's behalf short swing profits alleged to have been realized by Joseph A. Thomas, a director of Tide Water, and by Lehman Brothers, a partnership of investment bankers and stockbrokers, of which Thomas was a member, the complaint was dismissed as against all the partners other than Thomas, after a trial by the court without a jury, and judgment was entered against him for only $3,893.41 and costs. The trial judge computed the profits of Lehman Brothers at $98,686.77 but refused to direct judgment against Thomas for more than the amount which was, despite his claim that he had received no part of the profits, found to have been 'realized by him.' The method of computing the profits was also matter of dispute between the parties. Plaintiff and Thomas have filed cross-appeals. The opinion below is reported in 173 F.Supp. 590.
 
 
 2
 On August 5, 1954 Thomas, then a partner of Lehman Brothers, became a director of Tide Water. Although he succeeded John Hertz, also a partner of Lehman Brothers, Judge Dawson, after a careful and comprehensive review of the testimony, found that 'the invitation to join the Tide Water Board was upon the initiative of Tide Water.' He also found 'there was no evidence that the firm of Lehman Brothers deputed Thomas to represent its interests as director on the board of Tide Water.'
 
 
 3
 On September 17, 1954 public announcement was made in the Wall Street Journal that Tide Water was considering a proposal to allow shareholders to exchange common stock for a new dividendpaying preferred stock; and on October 8, 1954 it was announced in the Wall Street Journal that such a proposal had been approved by the directors. Immediately after this last announcement and on the same day Lehman Brothers, 'acting solely on the basis of Tide Water's public announcements and without consulting Thomas with reference thereto,' decided to purchase 50,000 shares of Tide Water common stock for the purpose of converting them into the new preferred stock and selling the preferred stock to institutional investors. Thomas had provided no confidential information whatever; and he did not even know the transaction concerning the 50,000 shares of Tide Water stock was under consideration by the Portfolio Committee of Lehman Brothers until the sales slips appeared upon his desk, after the first few thousand shares and been purchased. In response to his inquiry about this he was told that 50,000 shares of Tide Water Common were to be bought, converted into preferred and sold. Immediately thereafter Thomas instructed the firm controller 'to exclude me from any risk of the purchase or any profit or loss from the subsequent sale and to take the necessary steps to carry out my instructions.' At a meeting of the partners the following Monday he told the other partners that he wanted them to know that he was 'not a part of this Tide Water transaction at all,' and they agreed. He later filed SEC Form 4 from time to time setting forth all the facts required to be reported, explaining that these were 'transactions and holdings of Lehman Brothers a partnership of which I am a member. I have previously waived all interests in a total of 50,000 of these shares.'
 
 
 4
 Between October 8, 1954 and November 15, 1954 Lehman Brothers purchased the 50,000 shares of Tide Water common stock for $1,330,800. Pursuant to the contemplated plan of recapitalization, Lehman Brothers on December 8, 1954 exchanged its 50,000 shares of common stock for 50,000 shares of a new preferred stock issued by Tide Water. Between December 9, 1954 and March 8 1955 Lehman Brothers sold its 50,000 shares of preferred stock for $1,361,186.77. Out of the profits on this series of transactions within a period of six months Thomas received nothing, as his share of the partnership profits was calculated in accordance with his instructions to the firm controller and his oral agreement with his partners to the effect that he was to be cut out of the Tide Water Venture.
 
 The Claim Against Lehman Brothers
 
 5
 Plaintiff argues that judgment for the full amount of $98,686.77 should have been rendered against Lehman Brothers. On this phase of the case the contentions of the parties revolve about the decision of this Court in Rattner v. Lehman, 2 Cir., 1952, 193 F.2d 564, 566. While plaintiff does not state in so many words that he asks us to reconsider our rulings in that case, such is the purport of much that is argued in plaintiff's briefs, and I shall assume that the contention is: (1) that the decision in Rattner is unsound and the case should be overruled; and (2) that this case is distinguishable on the facts from Rattner.
 
 
 6
 In that case John D. Hertz, a partner of Lehman Brothers, was a director of Consolidated Vultee Aircraft Corporation. The firm had made short swing profits on the purchase and sale of consolidated Vultee common stock. Of these profits Hertz received $806.62 which he turned over to Consolidated Vultee. We refused to hold Lehman Brothers liable for the profits realized by the firm on the ground that Section 16(b) 'contains no provision requiring the partners of a director to account for profits realized by them.' In answer to the argument that this leaves a loophole in the law Judge Swan, writing for the court, observed that the omission of any provision for such liability 'was intentional,' as the legislative history of Section 16(b) indicated that a clause in the earlier drafts imposing such liability had been 'eliminated from the statute as finally enacted.' I feel bound by this ruling, especially since it has been in force for some eight years and the Congress has not seen fit to amend the statute; and Judge Swan and I vote to affirm the judgment in favor of Lehman Brothers on the authority of Rattner.
 
 
 7
 The alleged distinction between this case and Rattner on the question of the liability of the partnership is based upon a dictum by Judge Learned Hand in his concurring opinion in Rattner, to the effect that he agreed that Section 16(b) did not apply, 'but I wish to say nothing as to whether, if a firm deputed a partner to represent its interests as a director on the board, the other partners would not be liable.' Plaintiff in the case before us argues that there is ample proof that director Thomas was deputed by Lehman Brothers to represent its interests as a director on the board of Tide Water; but the trial judge states that he finds no such evidence in the case.
 
 
 8
 To begin with, Judge Swan and I do not agree with this dictum, as we must take Section 16(b) as we find it, and we do not see how any sort of deputizing can make the partners or the partnership a 'director' within the meaning of Section 16(b). But we do not have to decide the question, because the evidence in this case will not support an inference that Lehman Brothers deputized Thomas to represent its interests as director on the board of Tide Water. Doubtless the firm was pleased to have Thomas succeed Hertz as a director, and so was John Schiff, of Kuhn, Loeb & Company, who introduced his friend Thomas to David T. Staples, president of Tide Water who thereafter invited Thomas to become a director. However, there is no evidence of any deputizing or other affirmative action by the firm to cause Thomas to be made a director to protect the interests of the firm or to become its representative.
 
 
 9
 Reference is made in plaintiff's brief to certain general statements in the findings contained in the opinion in United States v. Morgan et al., D.C.S.D.N.Y.1953, 118 F.Supp. 621. These must be understood against the background of the entire history of the investment banking business in the United States that was in one way or another involved in the comprehensive and exceedingly complicated charges of conspiracy to violate the Anti-trust laws. Thus, in reference to a time prior to World War I, when there was a sort of informal working arrangement between Goldman, Sachs & Co. and Lehman Brothers, the opinion states (at page 639):
 
 
 10
 'With this background, it is eacy to see that many of the issuers, especially those whose securities were not well known to the public, leaned heavily upon the sponsorship of the investment banking firms under whose auspices the securities were sold. Issuers invited partners or officers of investment banking firms to serve on their boards of directions, in order to interest investors in their securities. Some of the prospectuses, which in those early days were little more than notices, stated that a partner or officer of a particular investment banking firm would go on the board of directors of the issuer whose securities were being offered to the public for sale. Investment bankers sometimes asked to be put on the boards of directors of issuers in order to know how they were managed and to protect the interests of the investors to whom they had sold the issuer's securities. Since the investment bankers sponsored the securities and lent their names to their sale, they felt a certain obligation to the investors to whom they sold the securities to see to it that the issuers did not adopt any policies or engage in any practices which would impair the value of those securities. This was especially important in connection with foreign investors.'
 
 
 11
 But general statements are of little assistance in the decision of particular issues. The fact that Thomas succeeded Hertz as a director of Tide Water, and the circumstance that there were other instances where one partner of Lehman Brothers succeeded another as a director in companies other than Tide Water, in the face of the credible and uncontradicted specific proof of the conversations that led up to the invitation by Staples to Thomas to become a director of Tide Water, are of no probative force whatever. Moreover, I do not think Lehman et al. v. Civil Aeronautics Board, 1953, 93 U.S.App.D.C. 81, 209 F.2d 289, certiorari denied, 1954, 347 U.S. 916, 74 S.Ct. 513, 98 L.Ed. 1072, has any bearing on the case before us.
 
 
 12
 For the above stated reasons Judge Swan and I find nothing here to distinguish this case from Rattner, which requires an affirmance of the judgment dismissing the case as against Lehman Brothers.
 
 The Claim Against Joseph A. Thomas
 
 13
 Insofar as plaintiff seeks a judgment against Thomas for the full amount of the profits realized by Lehman Brothers on the Tide Water venture, this was one of the points decided in Rattner and Judge Swan and I are content to follow that ruling. Here again, however, plaintiff claims the present case is distinguishable from Rattner. He relies upon a statement in the opinion of Judge Swan that both sides had assumed the stock purchases and sales were made without the knowledge of Hertz, and (193 F.2d at page 565) 'Whether the result might be different had he caused the firm to make them, we need not now determine.' Plaintiff in the case now before us insists that the proofs clearly demonstrate that director Thomas did cause Lehman Brothers to enter into the Tide Water stock venture, despite the findings of the trial judge to the contrary. We see no basis whatever for a decision by us that this finding of the trial judge is clearly erroneous. Indeed, it is the only finding permissible, as the trial judge believed the testimony adduced by Lehman Brothers to prove that director Thomas had revealed no confidential information whatever, and that he not only did not induce the firm to enter the venture, he had no knowledge that the matter was even under consideration. True he did say to some of his partners and to others as well that he liked the management of Tide Water and thought its general objectives were first-rate, but this is a far cry from the giving of confidential information concerning the forthcoming proposal for recapitalization by the exchange of common stock for a new dividend-paying preferred stock or otherwise causing or inducing the firm to purchase the stock. So, we must reach the same conclusion we did in Rattner: whether the result might be different had Thomas caused the firm to enter the Tide Water venture we need not now determine.
 
 
 14
 Judge Dawson held Thomas for the amount of the profits he would have received had he not attempted to disassociate himself from the 50,000 share transaction and waive his share of the profits. I agree with Judge Dawson that the profits for which he has been held accountable were, in contemplation of law, 'realized by him.'
 
 
 15
 This phase of the case presents an interesting and important question of novel impression that was left open in Rattner as Hertz did not resort to any waiver and disclaimer, as did Thomas in the case before us, and he had already voluntarily paid over to the corporation the $806.62 received by him as his share of the short swing profits of Lehman Brothers on the purchase and sale of Consolidated Vultee stock. This is not a question of New York partnership law, nor a question of Income Tax law, but rather and solely, as I see it, a question of the interpretation we are to give to a federal statute, Section 16(b).
 
 
 16
 I hold that when a partnership, one of the partners of which is a director of a corporation, makes short swing profits in speculative buying and selling of the stock of that corporation, the director must be said to have realized the share of the profits to which he would be entitled, irrespective of any waiver or disclaimer by him. Whether or not he actually receives his share of these profits is immaterial; he has 'realized' profits and must account for them.
 
 
 17
 There is only one way to prevent stock manipulation by insiders to whom confidential information is available, and that is to squeeze every possible penny of profits out of such transactions. This has been held to be the clear purpose of Section 16(b), a 'broadly remedial statute.' Smolowe v. Delendo Corp., 2 Cir., 136 F.2d 231, 239, 148 A.L.R. 300, certiorari denied, 1943, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446. One way to do this was to construe Section 16(b) to include the partnership because of the unity of the partnership relationship and the fact that one of the partners is a director. But Rattner decided otherwise, and that is water over the dam as far as I am concerned. If we now hold that the director himself can escape by the mere device of a waiver and disclaimer, we shall have opened a breach in the law through which stockbrokers and investment banking houses, those most likely to be in a position to profit by the use of confidential information in stock speculation, can pass with impunity.
 
 
 18
 While no confidential information was improperly used in this case, we must bear in mind that the statute is designed to affect cases where confidential information might be used. Moreover, to permit a waiver and disclaimer to immunize the director would almost certainly lead to wholesale waivers and disclaimers by the various partners who are directors of corporations, with the result that the profits waived by one partner would increase the profits of the others and in the end each would have about the same amount of profits he would have received from such transactions had there been no waiver and disclaimer. When the Congress passed Section 16(b) it was never intended to permit any such merry-go-round as this.[2]
 
 
 19
 The Method of Computing the 'Profits Realized by' Thomas
 
 
 20
 The 50,000 shares of common stock of Tide Water were purchased by Lehman Brothers between October 8, 1954 and November 15, 1954; they were converted into the new preferred stock on December 8, 1954; and the 50,000 shares of new preferred stock were sold between December 9, 1954 and March 8, 1955. Thus all of these transactions occurred within the short swing period of six months specified in Section 16(b). If the conversion into the preferred stock constituted a 'purchase' under Section 16(b) the profits amounted to $98,686.77, and the amount of these profits 'realized' by Thomas was $3,893.41, as held by Judge Dawson. But Thomas contends that the conversion was not a 'purchase' and that the profit must be computed by subtracting the cost of the shares of common stock from the amount received on the sale of the preferred stock, or $30,386.71.
 
 
 21
 We are not, however, computing profits in accordance with what might be the custom of traders and speculators in the stock market. We are construing a federal statute designed to prevent certain persons, including directors and officers, from making short swing profits by 'the unfair use of information' available to them because of their confidential relationship to the corporation. The cases present the problem of what is a 'purchase' in a great variety of factual combinations. But the underlying principle, as I understand it, is that the transaction is a 'purchase' if in any way it lends itself to the accomplishment of what the statute is designed to prevent. The leading case is Park & Tilford, Inc. v. Schulte, 2 Cir., 160 F.2d 984, certiorari denied, 1947, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347. While we held the transaction not to be a 'purchase' in Roberts v. Eaton, 2 Cir., 1954,212 F.2d 82, the same line of reasoning was used.[3] What was done in that case did not lend itself to the furtherance of the prohibited purpose. There is no rule of thumb; nor would it be wise to attempt to formulate such a rule.
 
 
 22
 Here the acquisition of the preferred stock was in all respects voluntary; Lehman Brothers had the choice of retaining its common stock or exchanging it for preferred stock. The stock of Tide Water was registered on the New York Stock Exchange and was widely held by the public. When the common was acquired the success of the Lehman Brothers Tide Water venture still depended on future shareholder approval. It was only after approval, the issuance of the preferred stock and the exchange that the profits were realized. The exchange constituted a necessary step to the consummation of the plan. We cannot say that such a situation did not lend itself to manipulation and to the making of short swing profits within the meaning of Section 16(b). We hold the exchange was a 'purchase' and that the profits realized were properly computed by Judge Dawson.
 
 Interest
 
 23
 Judge Dawson refused to allow interest on the recovery against director Thomas. It is well settled that the allowance of interest in Section 16(b) cases is not mandatory. Magida v. Continental Can Co., 2 Cir., 1956,231 F.2d 843. Judge Swan and I do not believe it was an abuse of judicial discretion to refuse such an allowance of interest in this case.
 
 
 24
 Affirmed.
 
 
 25
 On Motion of S.E.C. for Leave to Participate as Amicus Curiae and to
 
 File Petition for Rehearing
 
 26
 PER CURIAM.
 
 
 27
 Motion for leave to participate as amicus curiae and to file petition for rehearing is denied.
 
 
 28
 SWAN and MEDINA, Circuit Judges, concur.
 
 
 29
 CLARK, Circuit Judge.
 
 
 30
 I dissent and vote for a rehearing in banc.
 
 
 31
 On Petition for Rehearing in Banc.
 
 
 32
 LUMBARD, Chief Judge.
 
 
 33
 The active judges, having voted to deny the petition for rehearing in banc, except Judges CLARK and SMITH who dissent and vote to grant the petition, the petition is denied.
 
 
 34
 SWAN, Circuit Judge (dissenting in part).
 
 
 35
 I agree with my brother Medina to affirm the judgment insofar as it dismissed the action as against the partners, other than Thomas, of Lehman Brothers. With respect to Thomas, I think he should be held liable in an amount less than the judgment against him awarded Tide Water.
 
 
 36
 In my opinion we should differentiate between the shares of Tide Water stock purchased before and those purchased after Thomas, with his partners' consent, withdrew from any participation in the partnership purchases of such stock. As to profits attributable to the shares purchased before Thomas' withdrawal, I think it reasonable to hold that Thomas could not relieve himself from liability by transferring to the other partners his share of such profits and, consequently, he can be held to have 'realized' such profits within the meaning of the statute. But this argument is inapplicable to the shares purchased after Thomas withdrew. It is my understanding that a partnership agreement can be modified by parol so as to exclude one partner from participating in investments or sharing in the profits or losses on investments made subsequent to the modification. As to profits attributable to the after-purchased shares, Thomas had no interest to transfer to Lehman Brothers and I do not see how he can be held to have 'realized' any profit on such shares. Consequently I think on Thomas' appeal the cause should be remanded for determination of the correct amount of the judgment to be awarded against him. As to the method of computing the profits and the non-allowance of interest I agree with my brother Medina.
 
 
 37
 CLARK, Circuit Judge (dissenting).
 
 
 38
 Against the background of 'a widely condemned evil,' 16(b) of the Securities Exchange Act of 1934 put teeth into the concept of a corporate director's fiduciary obligation by the simple but arbitrary course of requiring him to disgorge to his corporation 'insider' profits from stock speculation obtained under stated circumstances and without regard to his own good faith or innocence. This device has worked successfully where more refined methods might have failed; and although the provision 'is probably the most cordially disliked provision in all these statutes from the point of view of those whom it affects,' Loss, Securities Regulation 587 (1951), yet its policy is so important and so generally approved that repeal seems unlikely, id. 579; Cook & Feldman, Insider Trading under the Securities Exchange Act, 66 Harv.L.Rev. 385, 612, 641 (1953). In our first case construing it was said, 'The statute is broadly remedial,' and went on to say: 'We must suppose that the statute was intended to be thoroughgoing, to squeeze all possible profits out of stock transactions, and thus to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary officer, director, or stockholder and the faithful performance of his duty.' Smolowe v. Delendo Corp., 2 Cir., 136 F.2d 231, 239, 148 A.L.R. 300, certiorari denied Delendo Corp. v. Smolowe, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446. That principle has since shaped our statutory interpretation as well as that of other courts and is restated in our latest and full opinion in Adler v. Klawans, 2 Cir., 267 F.2d 840.
 
 
 39
 To this uniform interpretation there appears to have been one notable exception, the decision relied on as authoritative here, Rattner v. Lehman, 2 Cir., 193 F.2d 564. That case held that where a director was fortunate enough to be a partner in a brokerage firm which did the actual trading, he and his partners were relieved of liability for insiders' profits perhaps in all cases, but in any event in nearly all. The decision below, affirmed by my brother Medina, goes far to complete the process of complete immunity toward which my brother Swan, with relentless logic, tends. I think the principle is anomalous in granting exemption in the very cases where the incentive to take insiders' profits is strongest as a part of a trading firm's normal business and where exception is the most difficult to understand. So I believe we should review the ruling in the light of experience and the present-day situation. And at the very least we should request assistance in the form of a brief amicus curiae from the S.E.C., which has often been most helpful on mooted issues in the past, but which has here not allayed, but has rather added to, the confusion, as I point out hereinafter.
 
 
 40
 I suggest that re-examination of the Rattner precedent is indicated for several reasons: the circumscribed nature of the discussion there had; the teaching of later experience; the equivocal position of the S.E.C. now apparently clarified contra to the decision; and the confusion as to its possible scope and real or apparent exceptions. My own conclusion is that the case should be overruled or at least limited and that the partners here, including Thomas, should be required to pay Thomas' company the profits they made from short-swing trading in its stock.
 
 
 41
 The Rattner decision appears to be supported on three grounds, two of them stated in the opinion and a third adduced by later commentators. First reliance is placed upon a 'literal reading' of the statute. But any reading, literal or otherwise, can hardly avoid the legal meaning of 'owner' or eliminate the basic principles of partnership. Under these principles, clearly stated in New York law as embodied in the Uniform Partnership Act, property bought with partnership funds is partnership property, and a partner is co-owner with his partners of specific partnership property holding as a tenant in partnership with an equal right with his partners to possession of specific partnership property and with an equal share in the profits and surplus. N.Y. Partnership Law 12, 40, 43, 50-52. Moreover, the partnership is charged with knowledge of or notice to a partner. Id. 23. I submit that on a literal legal reading of the statute, Thomas was co-owner with all the other partners of the Tide Water stock when bought and of the profits when sold, and that Thomas stood at all times legally charged with full knowledge of what was going on in his firm, just as other partners had like knowledge. Further, I do not doubt that in any ordinary well run partnership, the practical facts of life actually coincide with these legal facts, and that one partner either actually knows what is going on in his group or is content to leave action to his colleagues. In any event, the legal situation seems clear-- so much so that in my view co-owners cannot be excluded from the operation of the statute without a serious distortion of its terms. Furthermore to close the gap now opened up would require rather awkward and seemingly superfluous phraseology, such as that 'owner' actually does include 'co-owner.'
 
 
 42
 A second ground of support for the decision was deduced from the legislative history and from the fact that a provision in earlier drafts which had made liable any person who acted on confidential information disclosed by a director was eliminated from the statute as finally enacted. But as the S.E.C. pointed out in its brief amicus curiae in Rattner, this history, so far as pertinent, really points the other way and in favor of an automatic application of the statute without the necessity of proving the parties' intent. That, too, is the view of the legislative history we emphasized in Smolowe v. Delendo Corp., supra, 2 Cir., 136 F.2d 231, 235, 236. But the Rattner decision forces for this important class of cases the very step which we felt Congress had avoided, namely, a 'subjective standard of proof, requiring a showing of an actual unfair use of inside information.' 2 Cir., 136 F.2d 231, 236.
 
 
 43
 The third ground of support, adduced by some commentators, 25 So.Calif.L.Rev. 475, 478 (1952), 100 U. of Pa.L.Rev. 463, 465 (1951),[1] is the harshness in result of the contrary conclusion. Passing the question whether Congressional intent is to be thus limited, one may question whether this is not an attack on the entire statutory policy which is somewhat misdirected when leveled only at a single consequence as here. Admittedly the statute operates stringently, with burdensome results toi individuals, in many, possibly most, cases. But that seems not a sound reason for excepting its operation in this important and natural field of operation. True, the amounts involved may be large, as is to be expected from the high financial character of the protagonists naturally involved in the trading by Wall Street investment firms. But that may be easily taken as an argument for application of the statute here.[2] I think the exemption of these firms would be hard to explain to the ordinary small-scale director not so exempt and indeed to the investing public generally.
 
 
 44
 But if the requirement of a subjective standard of proof is to stand, then the question at once arises as to how much. And here the Rattner case did at least suggest the possibility of some limitation. The majority expressly declined to consider whether the result might be different had the partner 'caused' the firm to make the short-swing transactions. Judge L. Hand in an obviously worried concurrence went further and, assuming for his disposition of the case that the firm had bought and sold the shares without any advice or concurrence by the director-partner, intimated that the result might be different if a firm deputed a partner to represent its interests as a director on the board. Here the evidence of director-participation is rather sharper than Judge Medina intimates and goes so far that it is hard to see what more the director could have done to assist his partners short of doing the trading himself. For in his deposition Thomas stated that he had suggested to his partners 'from time to time that I thought Tide Water under the new management was an attractive investment' and again, 'When the new management came in, my opinion was asked of what I thought of it, and after I watched them in, I expressed my opinion freely that I thought the management was first-rate, that the company would do well under that management.' He also said that one of the partners with whom he discussed the Tide Water management after he became a director was Mr. Hammerslough, the trading partner who actually directed the firm's purchases of Tide Water stock; and Hammerslough himself testified on deposition that after Thomas became a director he 'spoke very highly of the management and prospects of the Tide Water Oil Company. I believe he thought very highly of it.' Unless judges are to be incredibly naive as to the facts of financial life, it is difficult to see what Thomas needed to say more to show that the lily was already gilded. The facts as to the proposed Tide Water exchange were published in the Wall Street Journal so that further details as to that would have been quite superfluous. In fact I regard all this discussion whether or not the firm 'deputed' its members to sit on many corporate boards as naive. Obviously this was an arrangement of mutual benefit to both sides; what difference can it make in realities which extended the first invitation? And what further official 'deputation' is needed more than the mere fact of this mutually beneficial management? So unless Rattner is to afford exemption in almost all situations of financial importance, we must reverse to hold that the suggested exceptions here apply to support firm liability.
 
 
 45
 In this situation the S.E.C. has not yet afforded us its accustomed assistance. In the Rattner case its general counsel filed a brief amicus curiae wherein it first urged that the statute in terms was to be construed as I have stated above and much of the reasoning I have employed was there adduced in support of its view. Then it undermined its own opinion by urging that it had freed the defendants of liability by adopting its Rule X-16A-3(b) requiring a partner to file a report to it 'only as to that amount of such equity security which represents his proportionate interest in the partnership,' and that the defendants were justified in assuming the Commission to hold the other partners not liable here. The court in the Rattner case rejected this argument, saying: 'The Commission may exempt 'transactions'; but it cannot reduce the liability imposed by section 16(b).' Rattner v. Lehman, supra, 2 Cir., 193 F.2d 564, 566. That the Commission had its doubts at least as to the policy of its rule is shown by the following statement in its Rattner brief: 'For reasons summarized below the Commission now has substantial doubt as to whether Rule X-16A-3 fully effectuates the statutory purpose of Section 16. It is therefore currently considering amending the rule to limit the broad exemption now implicit in it.'
 
 
 46
 At any rate the Commission soon (1953) amended its rule to require a partner to report the entire amount of the security owned by the partnership, Rule X-16A-8(g), adopted by Sec. Ex. Act Rel. 4801 (1953), now 17 CFR (1960 Supp.) 240.16a-3(b). Loss, Securities Regulation 585-587 (1955 Supp.). And there the matter now stands, with the Commission at odds with our interpretation.
 
 
 47
 The matter of the validity of such a Commission regulation is obviously still an open one. We expressed doubt as to another rule in Greene v. Dietz, 2 Cir., 247 F.2d 689, which was thereafter held invalid in Perlman v. Timberlake, D.C.S.D.N.Y., 172 F.Supp. 246; but the contrary was held in Continental Oil Co. v. Perlitz, D.C.S.D.Tex., 176 F.Supp. 219. Seemingly the Commission still relies on its power under the statute. See Timbers, Management Compensation Plans: SEC Problems, Proceedings of the Second Annual Institute on Corporate Counsel, April 21, 22, 1960 (Fordham Univ. Press) 28, 37-38; Meeker & Cooney, The Problem of Definition in Determining Insider Liabilities Under Section 16(b), 45 Va.L.Rev. 949, 957 (1959); Cook & Feldman, Insider Trading under the Securities Exchange Act, 66 Harv.L.Rev. 385, 612, 632-635 (1953); Loss, Securities Regulation 578 (1951). This is an obvious state of confusion and uncertainty which is unfortunate to the public, the investors, and their traders. I do not believe any inference can be drawn from the failure of Congress to act to correct the Rattner decision; that body has lately been interested in other matters made immediately troublesome than that of the regulation of private investments and the S.E.C. obviously has not given it positive leadership. So it would seem to me that at least before we dispose of this vastly important issue we should ask the S.E.C. for its informed comments.
 
 
 48
 I should add that I agree with the method of computation, finding a 'purchase' under 16(b) and a total profit to the firm of $98,686.77, which Judge Dawson followed and Judge Medina approves in his opinion. But this computation, upon which we all agree, highlights the anomaly of the ultimate conclusions reached by my brothers. For they are forced to concede that insider profits were made and that there must be restitution to the corporation, but then they differ widely as to how much is to be restored. It seems to me that neither of their results can be justified logically or legally under any principles of the law of partnership with which I am familiar. I submit that if there were insider profits (as their concession shows) then the partnership and the individual partners must be held liable to return these profits in full to Tide Water. And that should be our decision. The final anomaly in our exceptional treatment of this case is the denial of all interest for the use of the sums found due the corporation, contrary to our uniform practice in other cases. Magida v. Continental Can Co., 2 Cir., 231 F.2d 843, 848, certiorari denied Continental Can Co. v. Magida, 351 U.S. 972, 75 S.Ct. 1031, 100 L.Ed. 1490; Blau v. Mission Corp., 2 Cir., 212 F.2d 77, 82, certiorari denied Mission Corp. v. Blau, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138; Park & Tilford v. Schulte, 2 Cir., 160 F.2d 984, 988, 989, certiorari denied Schulte v. Park & Tilford, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347. If there are special equities here, they have not been stated.
 
 
 49
 I would reverse and remand for the entry of a judgment returning to the Tide Water corporation all the profits made from the transaction by the defendants, together with interest and costs.
 
 On Petition for Rehearing in Banc
 
 50
 CLARK, Circuit Judge (dissenting).
 
 
 51
 The court's refusal by majority vote to take any steps to abate the confusion resulting from the decision by our senior panel hass striking connotations beyond those affecting the central issue on the merits, important as that is. Chief among these added consequences is the precedent-- the first time in our history-- of refusing the assistance of the Securities and Exchange Commission, here proffered as a result of the need therefor expressed by the writer as a member of the court. This re-enforces the harsh refusal of the original panel majority. Under the peculiar circumstances here present making S.E.C. advice more relevant even than usual, I should have thought that we would have accepted the offer with alacrity, whatever our eventual views as to the merits; and I am chagrined that an individual judge's 'right to know' is thus so severely circumscribed. Some instances where such help has been gladly received, as well as others where its absence is deplored, are noted in Greene v. Dietz, 2 Cir., 247 F.2d 689, 696. Even in the case which is being treated as controlling here, Rattner v. Lehman, 2 Cir., 193 F.2d 564, the court, although rejecting the Commission's advice in part, nevertheless paid it the compliment of devoting a major part of its discussion to the Commission's presentation. I submit with deference that the correct approach here was that followed in Greene v. Dietz, supra, 2 Cir., 247 F.2d 689, 697:
 
 
 52
 'Although neither appellant nor appellee sought a rehearing in this case, the Securities and Exchange Commission timely filed an application with us seeking our permission to file a petition, amicus curiae, for a rehearing. We readily granted such permission. The Commission represents to us that our opinion of June 7, 1957 should be clarified * * *. We are grateful to the Commission for the interest it has shown, and we order that the brief offered by it in support of its petition be filed and made a part of the records in the case.'
 
 
 53
 In my original dissent I pointed out why S.E.C. advice seemed particularly desirable here. In addition to the expertise which the Commission and its staff must necessarily have acquired over the years in an area particularly committed to its care, there were the special considerations that the Commission has long required reporting by trading partnerships of all insider shortswing profits acquired by them and hence must know the dimensions of the problem and further that the Commission had made changes in its regulations signifying lack of confidence in the Rattner rule, the rationale for which changes surely would be enlightening. Now the reasons presently stated by the Commission for its appearance intensify this need for enlightenment. For it requests granting of its petition for rehearing 'so as to permit the Commission to urge that this Court in its decision should overrule its earlier interpretation of Section 16(b) of the Securities Exchange Act of 1934 as enunciated in Rattner v. Lehman, 2 Cir., 193 F.2d 564.' An explanation of its reasons for coming to its present conclusion could hardly fail to be instructive.
 
 
 54
 My brothers offer no explanation of their decision, and the grounds therefor can only be inferred. But since a decision on the merits is avoided in a situation where the need therefor is great, it is probably a fair inference that procedural barriers were thought to exist. It is believed, however, that actually none such are discoverable. As concerns the S.E.C. it has followed the exact procedure found acceptable in Greene v. Dietz, supra, 2 Cir., 247 F.2d 689. The Commission states that it refrained from seeking to enter earlier because of its conclusion that the case here would turn on issues of fact-- a very reasonable deduction, since Rattner had assumed to settle the law. Undoubtedly, too, rejection of its views in the Rattner case obviously suggested caution until it received something approaching an invitation from members of the court. And if we are at all realistic we must recognize that changes in Commission personnel may well have resulted in a new and different policy.
 
 
 55
 The S.E.C. application is now supported by the plaintiff. Here, too, there seems to be some implication that he has been dilatory. But I do not see how this can be sustained. Notwithstanding the two long holiday week ends immediately after our decision he moved with due promptness, and within the 15 days stated in our Local Rule 25(a), for certification of the case to the Supreme Court. While this may not have been good tactics in view of our customary unwillingness to certify, yet it does show his desire and speedy attempt to secure some form of review. Upon denial of his motion by a divided court and the intervening application by the S.E.C., he promptly filed his motion and affidavit supporting the request of the S.E.C. to be heard in banc. Thus at no time has our decision become final, and it will not become so until the filing of the present order. Obviously there has been no prejudice to anyone by any supposed delay. Moreover, it has been our uniform practice to grant additional time for presentation of petitions for rehearing, since we have preferred to terminate the procees of adjudication by decisions on the merits rather than by application of some newly fashioned time barriers. Indeed I can recall no case where we have ever rejected a meritorious petition for rehearing on the ground that it was untimely. The fashioning of procedural rules ad hoc to avoid decision on the merits is always to be deplored. Clark, Code Pleading 71 (2d Ed. 1947).
 
 
 56
 I am bound to add that I consider all these implications of procedural barriers irrelevant; for even if these suitors could have been considered in default as private claimants, yet we must not overlook the fiduciary character in which they here appear. Both the Commission and the plaintiff are trustees of the public interest; their private interest is either nominal or, in the case of the Commission, nonexistent. At best they do but remind us of our own public responsibility. In such case I doubt if a few days' delay in the holidary season can properly be seized upon by us as justifying our inaction in the public regard. Consideration on the merits, far from according succor to the laggard, would be but a proper response to a judicial obligation to do justice to all, however incompletely represented.
 
 
 57
 But, whatever the reasons to be assigned for the result, it leaves this important area of the law almost ludicrously uncertain. What now is the present force to be assigned to Rattner? Although it is assumed to compel the present decision, yet quite significantly not a single word in its defense has been utered by any of the eight judges here engaged. My own criticisms uttered in my dissent have remained unanswered and have now, as is apparent, the support of the S.E.C. But even further, Judge Medina, in writing the main opinion and though he held himself bound by the decision, uttered as strong a criticism of its results as has appeared, in supporting the fundamentally inconsistent ruling that the partner-director must give up something representing his share of insider profits to the corporation. And in this Judge Swan concurred, although agreeing neither on the principle nor on the actual amount of the recovery. It is indeed ironical that so disfavored a precedent[1] nevertheless has apparent power to control even to the extent of ruling out proper restrictions or exceptions there at least implied with respect to a director who gives actual investment advice.
 
 
 58
 The most serious vice of the Rattner decision is the unfair discrimination it builds into an important remedial statute-- a discrimination substantially eliminating the great Wall Street trading firms from the statute's operation. So great is the unfairness of the result that, withstanding its remedial nature, the statute, it would appear, should not stand unless its judicially discovered defects can be corrected. But before that conclusion is finally reached let us hope that the S.E.C. may discover some tribunal prepared and willing to listen to its arguments.
 
 
 59
 SMITH, Circuit Judge, joins in the dissent of CLARK, Circuit Judge.
 
 
 
 [1]
 16(b), 15 U.S.C.A. 78p(b) reads as follows:
 'For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.'
 
 
 [2]
 There is some evidence of this here. During cross examination the defendant Thomas was asked:
 'Q. Is it customary for a partner who is a director in a corporation to waive his interests in the short swing profits realized by a corporation?'
 He answered:
 'A. I think customary is a pretty strong word. But all of us are aware of the existence of 16(b) and you certainly wouldn't want to find yourself in that predicament.'
 
 
 [3]
 See also Ferraiolo v. Newman, 6 Cir., 1958, 259 F.2d 342, 345, certiorari denied, 1959, 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629; Blau v. Mission Corp., 2 Cir., 1954, 212 F.2d 77; Shaw v. Dreyfus, 2 Cir., 172 F.2d 140, certiorari denied, 1949, 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719; Blau v. Lamb, D.C.S.D.N.Y.1958, 163 F.Supp. 528, 534; Blau v. Hodgkinson, D.C.S.D.N.Y.1951, 100 F.Supp. 361; Truncale v. Blumberg, D.C.S.D.N.Y.1948, 80 F.Supp. 387
 
 
 [1]
 Other comments on the decision appear in Loss, Securities Regulation 585 (1955 Supp.), and Cook & Feldman, Insider Trading under the Securities Exchange Act, 66 Harv.L.Rev. 385, 391, 403, 633-634 (1953)
 
 
 [2]
 Enforcement of strict accounting and refund against corporate fiduciaries is not exactly a novel legal idea. See Gratz v. Claughton, 2 Cir., 187 F.2d 48, 49, certiorari denied 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353; Berner v. Equitable Office Bldg. Corp., 2 Cir., 175 F.2d 218; Nichols v. S.E.C., 2 Cir., 211 F.2d 412, 417-418; Surface Transit, Inc. v. Saxe, Bacon & O'Shea, 2 Cir., 266 F.2d 862, 868; In re Midland United Co., 3 Cir., 159 F.2d 340; Woods v. City Nat. Bank & Trust Co. of Chicago, 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820; Loss, Securities Regulation 594 (1955 Supp.)
 
 
 [1]
 It has remained uncited elsewhere except for one purely incidental reference in Lehman v. Civil Aeronautics Board, 93 U.S.App.D.C. 81, 209 F.2d 289, 294, note 9, certiorari denied 347 U.S. 916, 74 S.Ct. 513, 98 L.Ed. 1072