**CONTINENTAL OIL COMPANY, a corporation, Plaintiff,**

v.

**Charles A. PERLITZ, Jr., Defendant.**
**No. 12228.**

United States District Court
S. D. Texas,
Houston Division.
Aug. 7, 1959.

**220**

Butler, Binion, Rice & Cook, Percy D. Williams, Houston, Tex., for plaintiff.

Baker, Botts, Andrews & Shepherd, Homer L. Bruce, Houston, Tex., for defendant.

INGRAHAM, District Judge.

In this cause both plaintiff and defendant have filed motions for summary judgment with supporting affidavits and counteraffidavits. The court finds the facts to be those admitted by the pleadings or by noncontroverted affidavits and as further found in this opinion.

At all times material to this cause plaintiff has been a corporation with its capital stock registered on the New York Stock Exchange, a national securities exchange, and defendant has been a director and officer of plaintiff. Plaintiff and defendant are therefore for the purposes of this cause subject to the applicable provisions of the Securities Exchange Act of 1934, as amended, 48 Stat. 896, 63 Stat. 107, 15 U.S.C.A. § 78a et seq., herein referred to as the Exchange Act. This is a suit by plaintiff under Section 16(b) of the Exchange Act (15 U.S.C.A. §§ 78p and 78aa) to recover the profits realized by defendant as a result of sales by defendant of certain shares of defendant's capital stock on May 16 and 17, 1957, and the purchase by him of shares of the same stock on August 28, 1957, within six months after the prior sales. The amount realized by defendant from the May, 1957, sales was greater than the price he paid for a corresponding number of shares in August, 1957.

Since 1952 plaintiff has had in effect a restricted stock option plan for officers and other key employees and in that year defendant as an officer of plaintiff was granted under that plan an option to purchase from plaintiff a given number of shares of plaintiff's stock at a fixed price. However, the option could not be exercised in whole or in part for at least two years after it was granted to defendant. Because of a later two for one split of plaintiff's stock, the number of shares still remaining under defendant's option was doubled and the price to be paid was halved. The stock purchased by defendant on August 28, 1957, was capital stock of plaintiff purchased by defendant under that option.

Section 16(b) of the Exchange Act is as follows:

"Sec. 16. (b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any in-

tention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. *This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."* 15 U.S.C.A. § 78p(b). (Emphasis supplied.)

Plaintiff asserts that under this Section 16(b) plaintiff is entitled to recover the profit realized by defendant under his May, 1957, sales and August, 1957, purchases.

Defendant's first ground of defense is that the Securities and Exchange Commission (herein referred to as the Commission) by its Rule X–16B–3, adopted by it under the authority of Sections 16(b) and 23(a) of the Exchange Act, exempted defendant's said sales and purchases from the operation of Section 16 (b). It is admitted that plaintiff's restricted stock option plan and plaintiff's individual option met the requirements of Rule X–16B–3, but plaintiff urges that Rule X–16B–3 is invalid. It is further admitted that, if plaintiff is entitled to any recovery from the defendant, it will be limited to the amount determined under Rule X–16B–6 of the Commission.

Defendant's second ground of defense will be discussed later.

Rule X–16B–3 is as follows:

### "Rule X–16B–3

"Any acquisition of non-transferrable options or of shares of stock including stock acquired pursuant to such options by a director or officer of the issuer of such stock shall be exempt from the operation of section 16(b) of the Act if the stock or option was acquired pursuant to a bonus, profit-sharing, retirement, stock option, thrift, savings or similar plan meeting all the following conditions:

"(a) The plan has been approved specifically, or through the approval of a charter amendment authorizing stock for issuance pursuant to the plan

"(1) by the holders of at least a majority of the securities of the issuer present or represented and entitled to vote at a meeting for which proxies were solicited substantially in accordance with such rules and regulations, if any, as were then in effect under section 14(a) of the Act, whether or not such rules and regulations were applicable to such solicitation, or by written consents of the holders of at least a majority of the securities of the issuer entitled to vote solicited substantially in accordance with such rules and regulations; or

"(2) by the security holders of a predecessor corporation in the manner provided in subparagraph (1) of this paragraph (a) if the plan, or obligations to participate hereunder, were assumed by the issuer in connection with the transaction of succession.

"(b) The plan effectively limits (subject to any provisions for adjustment of the plan or options outstanding thereunder to prevent dilution or enlargement of rights) the aggregate amount of funds or securities which may be allocated pursuant to the plan, either by limiting the maximum amount which may be allocated to each participant in the

plan or by limiting the maximum amount which may be so allocated to all such participants. Such limitations may be established for each fiscal year, or for the duration of the plan, whether or not the plan has a fixed termination date, and may be determined either by fixed amounts of securities or funds, or by formulas based upon earnings of the issuer, dividends paid, compensation received by participants, outstanding securities or percentages thereof outstanding from time to time, or similar factors which will result in a determinable limitation.

"(c) Unless the context otherwise requires, all terms used in this rule shall have the same meanings as in the Act or elsewhere in the General Rules and Regulations thereunder. In addition the following definitions apply:

"(1) the term 'plan' in this rule includes all plans whether or not set forth in any formal document;

"(2) the term 'non-transferable option' includes an option which by its terms is not transferable by such optionee otherwise than by will or the laws of descent and distribution, and is exercisable, during his lifetime, only by him."

Plaintiff in asserting the invalidity of Rule X–16B–3 relies upon the majority opinion of the Court of Appeals for the Second Circuit in Greene v. Dietz, 1957, 247 F.2d 689, and Perlman v. Timberlake, decided by the United States District Court for the Southern District of New York in the Second Circuit on March 26, 1959, 172 F.Supp. 246. The only other decisions dealing with this question of which the court is aware are Gruber v. Chesapeake & Ohio Railway Company, 158 F.Supp. 593 (December 18, 1957), by the United States District Court for the Northern District of Ohio, which held Rule X–16B–3 valid, and Emerson Electric Manufacturing Co. v. O'Neill, 168 F.Supp. 804 (November 10, 1958), by the United States District Court for the Eastern District of Missouri, which held it was unnecessary to pass upon the validity of the rule as the defendants were relieved of liability under Section 16(b) because of their reliance upon Rule X–16B–3 and the last sentence of Section 23(a) of the Exchange Act, which Section 23(a) is as follows:

"Sec. 23. (a) The Commission and the Board of Governors of the Federal Reserve System shall each have power to make such rules and regulations as may be necessary for the execution of the functions vested in them by this title, and may for such purpose classify issuers, securities, exchanges, and other persons or matters within their respective jurisdictions. No provision of this title imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule or regulation of the Commission or the Board of Governors of the Federal Reserve System, notwithstanding that such rule or regulation may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason." 15 U.S.C.A. § 78w(a).

The District Court in Greene v. Dietz, 143 F.Supp. 464, 465, held that Rule X–16B–3 was valid and in addition the defendants were protected by reliance on that Rule.

In addition to the briefs of the parties to this cause the court has been furnished with and considered the memorandum of the Commission filed in Greene v. Dietz, supra, in the Court of Appeals and the memoranda filed by the Commission in Perlman v. Timberlake, supra, and in a similar case in the same court, Van Aalten v. Hurley, D.C., 176 F.Supp. 851, all asserting the validity of Rule X–16B–3.

The attack upon the validity of Rule X–16B–3 and the authority of the Commission to promulgate it is based substantially upon two grounds. The first is that Section 16(b) seems to impose an absolute liability with no permissible ex-

ceptions upon a director or officer to account to his company for any profit that he may make in buying and selling securities of his company within any six months period. The second is that in the Congressional hearings leading to the enactment of the Exchange Act in 1934 there was a great deal of testimony concerning the use of options by directors and officers for their own private profit through inside information as to factors that would cause a material rise or fall in the market of their company's stock. It is, therefore, argued that the Commission had no authority to exempt from Section 16(b) any stock or securities purchased by an officer or director pursuant to an option granted to him by his company. In the consideration and weighing of these arguments certain underlying principles should be borne in mind.

The administration of many of the details that would necessarily arise under the Exchange Act was delegated by the Congress to the Commission just as the Congress placed under the jurisdiction of the Commission the enforcement of other Acts, such as the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., and the Public Utility Holding Company Act, 15 U.S.C.A. § 79 et seq. The Congress has by such delegations expressed its confidence in the ability and integrity of the Commission in carrying out the mandates thus entrusted to it. In speaking of the powers delegated to the Commission under the Public Utility Holding Company Act, the Supreme Court said in American Power and Light Company v. Securities and Exchange Commission, 329 U.S. 90, 105, 112, 67 S.Ct. 133, 142, 91 L.Ed. 103:

"The judicial approval accorded these 'broad' standards for administrative action is a reflection of the necessities of modern legislation dealing with complex economic and social problems. See Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 398, 60 S.Ct. 907, 914, 84 L.Ed. 1263. The legislative process would frequently bog down if Congress were constitutionally required to appraise before hand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation. Necessity therefore fixed a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules; it then becomes constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. * * *

* * * * * *

"It is a fundamental principal, however, that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarily a matter for administrative competence.' Phelps Dodge Corp. v. National Labor Relations Board, supra, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271. In dealing with the complex problem of adjusting holding company systems in accordance with the legislative standards, the Commission here has accumulated experience and knowledge which no court can hope to attain. Its judgment is entitled to the greatest weight, while recognizing that the Commission's discretion must square with its responsibility, only if the remedy chosen is unwarranted in law or is without justification in fact should a court attempt to intervene in the matter. Neither ground of intervention is present in this instance."

In United States v. Grimaud, 220 U.S. 506, 517, 31 S.Ct. 480, 483, 55 L.Ed. 563, the Supreme Court said in reference to regulations promulgated by the Secretary of Agriculture:

"From the beginning of the government various acts have been passed conferring upon executive officers power to make rules and regulations,—not for the government of

their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress, or measured by the injury done."

In Fawcus Machine Company v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 145, 75 L.Ed. 397, in speaking of regulations under the Revenue Act of 1918, the court said:

"Congress might have expressly declared that taxes should be excluded from invested capital. It did not do so in section 326(a), or elsewhere in the act. The regulations were made pursuant to express authority (see section 1309 of the Revenue Act of 1918). They are valid unless unreasonable or inconsistent with the statute. United States v. Grimaud, 220 U.S. 506, 517–518, 31 S.Ct. 480, 55 L.Ed. 563; International R. Co. v. Davidson, 257 U.S. 506, 514, 42 S.Ct. 179, 66 L.Ed. 341. They constitute contemporaneous construction by those charged with the administration of the act, are for that reason entitled to respectful consideration, and will not be overruled, except for weighty reasons. United States v. Moore, 95 U.S. 760, 763, 24 L.Ed. 588; Brewster v. Gage, 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457."

Among many similar expressions by the Supreme Court to the same effect reference may be made to its statement in Commissioner of Internal Revenue v. South Texas Lumber Company, 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831:

"This Court has many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons. See, e. g., Fawcus Machine Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 145, 75 L.Ed. 397."

■ It is fundamental that a statute is to be construed in the light of the purposes it seeks to achieve and the evils it seeks to remedy. Binkley Mining Co. of Missouri v. Wheeler, 8 Cir., 133 F.2d 863, 871. In National Labor Relations Board v. Lion Oil Company, 352 U.S. 282, 288, 77 S.Ct. 330, 334, 1 L.Ed. 2d 331, it is stated:

"In Mastro Plastics Corp. v. National Labor Relations Board, supra [350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309], we had before us another provision of § 8(d). What we said there in ruling out a narrowly literal construction of the words of the statute is equally apropos here. 'If the above words are read in complete isolation from their context in the Act, such an interpretation is possible. However, "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." United States v. Boisdore's Heirs, 8 How. 113, 122, 12 L.Ed. 1009.' 350 U.S. at page 285, 76 S.Ct. at page 359."

As to the argument based upon the word "option" as referred to in the 1934 Congressional hearings and as used in Rule X–16B–3, it must be borne in mind that that word may well have entirely different connotations, depending upon the circumstances surrounding its use. This was pointed out by the Supreme Court in People of Puerto Rico v. Shell Co., 302 U.S. 253, 258, 58 S.Ct. 167, 169, 82 L.Ed. 235:

"Words generally have different shades of meaning, and are to be

construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed. Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 608, 76 L.Ed. 1204; Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 86, 87–88, 55 S.Ct. 50, 51, 52, 79 L.Ed. 211."

The Exchange Act by its express words recognizes that Section 16(b) does not lay down any inflexible rule as to the liability of officers and directors of a Company. If such were the case, then the provision in Section 16(b) that this subsection shall not be construed to cover any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection would be entirely meaningless. In addition Section 3(a) (12) exempts entirely certain specifically named securities and such other securities as the Commission may by regulation exempt from the Act.

From the very beginning down to the present time the Commission has interpreted Section 16(b) as not having such an inflexible character. Section 34 of the Exchange Act provided that it should become effective on July 1, 1934, except that Section 16 and certain other sections should not become effective until October 1, 1934. Immediately after the passage of the Exchange Act the Commission provided for one exemption from Section 16(b) as follows (17 C.F.R., Title 17, Sec. 240.16b–1):

"Sec. 240.16b–1 Exemption of certain transactions originating prior to October 1, 1934, from section 16(b). A purchase which is effected before October 1, 1934, followed by a sale after October 1, 1934, within 6 months of such purchase, or a sale which is effected before October 1, 1934, followed by a purchase after October 1, 1934, within 6 months of such sale, shall be exempt from the provisions of section 16(b)."

On October 9, 1935, the Commission announced by its Release No. 392 (Class B) that it was providing for an exemption of stock bought under stock option plans meeting certain conditions. That release was as follows:

"The Securities and Exchange Commission has adopted a rule affecting directors, officers and employees of companies, with respect to profits from future sales of securities purchased under stock option plans entered into before the passage of the Securities Exchange Act. The rule provides, in effect, that such persons are exempt from the provisions of Section 16(b) of the Act if:

"(1) The plan was entered into prior to June 6, 1934;

"(2) The plan was approved by stockholders;

"(3) The option is non-transferable;

"(4) It is exercisable only at a price higher than that prevailing at the time of stockholders' approval; and

"(5) It was granted during or in connection with the employment of the option holder."

As pointed out by the Commission in its memorandum filed with the Court of Appeals in Greene v. Dietz, supra, stock options were used for the private profit of inside directors and officers and were one of the factors bringing about the enactment of Section 16(b). There were many methods by which they were so used, but one or two illustrations will point to the evil Congress sought to cure. The directors decide for their company to begin paying dividends but before announcing this fact they. grant to themselves and officers options to buy stock at the then depressed price. The dividend policy is then announced, followed by a rise in the price of the stock. The option holders then buy at the option price and sell on the rising market. In another case the directors, knowing

in advance of some adverse company situation, take an option for the then current price and promptly sell the stock short. If the stock goes down, they cover their short position by purchases in the open market at a profit, but, if they should have miscalculated and the stock would rise, they could protect themselves against loss by exercising their option. However, the Commission in its memorandum referred to above stated:

"It does not follow that because some stock options are pregnant with fraudulent possibilities that every type of option is necessarily so."

It will be noted that the Commission in exempting stock options in its Release No. 392 effectively excluded these secret options by providing they must have been issued under a plan approved by the stockholders.

While, as shown by the Commission's Release No. 392, stock option plans for employees were known prior to 1934, their use was not of wide occurrence. However, as time passed and the high income tax rates resulting from World War II came into effect, the use of stock grants and stock options as a means of remunerating officers and employees became more widespread. One kind of plan was to provide for the issuance of stock to employees as part of their compensation. The question then arose as to whether, if an officer sold any stock so received by him within six months after its receipt, he would be required to account to his company for the sales price under Section 16(b). As shown by its Release No. 4253 of May 6, 1949, the Commission held hearings on this question and as a result amended Rule X–16B–3 so as to exempt from Section 16(b) any stock so acquired if acquired solely for services and under a plan approved by the stockholders. This rule did not cover stock purchased under a stock option.

As shown by the Commission's Release No. 4509 of October 30, 1950, there had for some time existed a controversy as to proper method of computing profits under Section 16(b) where stock had been purchased under an option. At that time such stock was still not exempt from Section 16(b). The Commission held extensive hearings on the matter and as a result adopted the present Rule X–16B–6. In substance it provided that, if the stock were acquired under an option and the option either (1) had been acquired more than six months prior to its exercise, or (2) had been acquired under an employment contract entered into more than six months before its exercise, then the liability under Section 16(b) should not exceed the difference between the proceeds of the sale and the lowest market price of the stock within six months before or after the sale.

Insofar as this court is informed, no question as to the validity of any of the foregoing rulings and regulations of the Commission has been raised in any court.

As stated above, the practice of corporations in providing in employment contracts with officers for additional compensation through the issuance to them without further cost of stock or the granting of options to buy stock became much more extensive. However, in 1945, the Supreme Court in Commissioner of Internal Revenue v. Smith, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830, held that, when an employee exercised such an option, he received ordinary taxable income in an amount equal to the excess of the then market value of the stock over the option price. Thereafter Section 218 of the Revenue Act of 1950 (64 Stat. 906, 942) added Section 130A to the Internal Revenue Code of 1939, 26 U.S.C. § 130A (brought forward as Section 421 of the Internal Revenue Code of 1954, 26 U.S.C. § 421) which provided in substance that an employee would not realize taxable income upon his purchase of stock in his company if the purchase were made pursuant to a stock option of the kind specified in that section.

As stated by the Commission in its announcement of May 18, 1956, (21 F.R. 3646) promulgating Rule X–16B–3 in its present form, the Rule was adopted as a result of the Revenue Act of 1950. A brief review of the record of the Commission in connection with this Rule re-

veals a careful and conscientious study upon its part of the questions and implications involved.

On January 10, 1951 (16 F.R. 508) it gave notice of its intention to amend the Rule as it then existed and invited comments. On March 19, 1951, (16 F.R. 2679) it published the Rule in a new form. Again on June 18, 1952 (17 F.R. 5673) it published notice of further proposed changes, and on September 24, 1952, (17 F.R. 8900) it made certain further changes. On August 16, 1955, (20 F.R. 6195) and March 21, 1956, (21 F.R. 1934) it proposed further modifications, and on May 18, 1956, (21 F.R. 3646), after considering all comments offered, adopted Rule X–16B–3 in its present form. In its various announcements referred to it set out the background of the Rule and the considerations that caused the Commission to adopt it. Particular reference is made to the statements by the Commission in its Release No. 4509 of October 30, 1950, in announcing the adoption of Rule X–16B–6 and in its announcements of March 21, 1956, (21 F.R. 1934) and May 18, 1956, (21 F.R. 3646) in adopting Rule X–16B–3 in its present form. In those documents the Commission discusses in detail the background of these Rules and the considerations that led to their adoption.

The court is of the opinion that Rule X–16B–3 is valid and that defendant's motion for summary judgment should be granted.

The Second Circuit cases, holding that Rule X–16B–3 is invalid, appear to be based on a "possibility of abuse as supposed and conjectured by judges," as Judge Lumbard stated in his dissenting opinion on rehearing in Greene v. Dietz, 247 F.2d 689, at page 697. Judge Lumbard pointed out in his dissent to the first opinions in Greene v. Dietz that the Commission had concluded that there was little, if any, danger in exempting restricted stock option plans from Section 16(b) and that no proof had been offered to show that such danger had actually materialized or that subsequent events had made it more likely that it might materialize. Thus he stated:

"In these circumstances it seems hardly fitting for judges relatively untutored in such matters to substitute their judgment for the expert determination of the Securities and Exchange Commission. Unless and until there is a clear showing that the Commission has opened a door which Congress meant to keep shut, I would leave it to the Commission and the Congress to administer and legislate thereon respectively. On the record before us these are matters for executive and legislative action rather than by judicial interference." Greene v. Dietz, at page 697.

Furthermore, he stated in his dissenting opinion on rehearing:

" * * * the question we must ask is not whether isolated instances of abuse may result from this exemption, but whether the Commission was reasonable in deciding that 'the possibility of the use of inside information * * * appeared slight by comparison with the interference by the statute with legitimate trading.' * * * the majority's approach which looks only to whether any abuse is possible, writes the Commission's rule-making power out of the statute for almost any exemption will permit some possibility of abuse. To put the matter another way, it may hardly be said as to any exemption that some abuse is not possible." Greene v. Dietz, at page 698.

An examination of Greene v. Dietz and Perlman v. Timberlake clearly shows that these decisions would strike down Rule X–16B–3 on the possibility that it would permit abuses and that there has not been a clear showing that the Commission did not act reasonably in promulgating the Rule and within the purpose of the subsection.

Defendant presents a second ground for the granting of his motion for summary judgment based on his entry into

these transactions in allegedly good faith in conformity with Rule X–16B–3. He claims the benefit of Section 23(a) which exempts from the provisions of the statute imposing liability any act done or omitted in good faith in conformity with any rule or regulation of the Commission, notwithstanding that such rule or regulation may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason. It is unnecessary to reach this question, since the court holds that Rule X–16B–3 is valid.

Defendant's motion for summary judgment will be granted. The clerk will notify counsel to draft and submit judgment accordingly.