Harold **KORNFELD** and Thelma Kornfeld, stockholders of The Norwich Pharmacal Company, suing on behalf of themselves and all other stockholders similarly situated and on behalf and in the right of The Norwich Pharmacal Company, Plaintiffs,

v.

Thomas J. **EATON** and The Norwich Pharmacal Company, Defendants.

United States District Court
S. D. New York.
April 24, 1963.

Morris J. Levy, New York City, for plaintiffs.

Hancock, Dorr, Ryan & Shove, Syracuse, N. Y., for defendant, Thomas J. Eaton; Philip T. Seymour, William Allen, Jr., Syracuse, N. Y., of counsel.

Bernard J. Schulte, Bradford S. Allen, Terrence A. Elkes, Norwich, N. Y., for defendant, The Norwich Pharmacal Co.

Peter A. Dammann, Gen. Counsel, Walter P. North, Assoc. Gen. Counsel, Jacob H. Stillman, Washington, D. C., of counsel, for Securities and Exchange Commission, amicus curiae.

WEINFELD, District Judge.

These are cross-motions for summary judgment in an action brought under

section 16(b) of the Securities Exchange Act of 1934 [1] on behalf of the Norwich Pharmacal Company to recover short-swing profits realized by one of its officers and directors. The matter is ripe for summary judgment since the basic facts are not in dispute. What is at issue is the validity of Rule X–16B–6 of the Securities and Exchange Commission which in effect limits the amount of profits recoverable when stock, involved in a short-swing transaction, has been purchased by an "insider" [2] by the exercise of an option acquired more than six months before its exercise. In short, the Rule recognizes a distinction between the long term and short term aspects of profits realized in such purchases and sales, and grants exemption only on the long term profits. The Commission appears as amicus curiae and urges the validity of its Rule,[3] which provides in pertinent part:

"(a) To the extent specified in paragraph (b) of this section the Commission hereby exempts as not comprehended within the purposes of section 16(b) of the act any transaction or transactions involving the purchase and sale or sale and purchase of any equity security where such purchase is pursuant to the exercise of an option or similar right either (1) acquired more than six months before its exercise, or (2) acquired pursuant to the terms of an employment contract entered into more than six months before its exercise.

"(b) In respect of transactions specified in paragraph (a) of this section the profits inuring to the issuer shall not exceed the difference between the proceeds of sale and the lowest market price of any security of the same class within six months before or after the date of sale. Nothing in this section shall be deemed to enlarge the amount of profit which would inure to the issuer in the absence of this section."

The undisputed facts are:

The defendant Thomas J. Eaton, at all times hereinafter mentioned, was a director and officer of the Norwich Pharmacal Company, the stock of which was listed on the New York Stock Exchange. On August 23, 1956 Norwich granted to Eaton an option to purchase 2,000 shares of its common stock at ninety-five per cent of its fair market value at the time of the grant of the option. The then market price was $13.63 per share and the option price was $12.95 per share.[4] The option was exercisable at any time within eight years after its issuance; it was conditioned upon continuance in Norwich's employ for one year after grant and was not transferrable or assignable except by will or intestacy. The option was granted and the conditions attached thereto were pursuant to a Key Employees' Stock Option Plan approved in September, 1951 by the Norwich stockholders. Eaton did not exercise his option until almost four years after it accrued, when on July 12, 1960 he purchased 2,000 shares of the stock

1. 15 U.S.C. § 78p(b) (1958): "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, * * * shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer * * *. This subsection shall not be construed to cover * * * any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

2. "Insider" refers to the officers, directors and ten per cent holders of any class of equity security. 15 U.S.C. § 78p(a) (1958).

3. 17 C.F.R. § 240.16b–6 (1963 Cum. Supp.).

4. These are adjusted prices since there were two successive two-for-one splits in the stock subsequent to the date of the grant.

at $12.95 per share. Within six months before this purchase, between February 25 and May 12, 1960, on three separate occasions he sold a total of 2,228 shares of Norwich common stock at net prices ranging from $40.55 to $44.93 per share. There is no dispute but that the foregoing sales and purchase come within the scope of section 16(b). The range of the lowest price of the stock at any time within six months before or after the respective sale dates of the stock was between $32.50 and $37.25 per share.

In October, 1961 plaintiffs' attorney requested Norwich to institute suit against Eaton to recover the short-swing profits realized by him upon the transactions. Thereafter, upon Norwich's demand, Eaton paid to Norwich $15,418.96 together with interest from July 12, 1960 to the date of payment. Plaintiffs concede that the sum was computed in accordance with the provisions of Rule X–16B–6. However, contending that the Rule was invalid, they demanded that Norwich institute action to recover the claimed additional profits, which they computed at $45,945.62 plus interest. This figure is based upon their contention that the purchase price of the stock was its value on the day the options accrued, to wit, on August 23, 1956, when the market value was $13.63. The company refused, whereupon the present suit was commenced.

The plaintiffs' fundamental position is that the Rule is beyond the power of the Commission since it offends the basic purpose of section 16(b) of the Act and, in any event, since it limits the amount of profits recoverable from a short-swing transaction, it exceeds the Commission's statutory power of exemption. Eaton and Norwich not only join the SEC in urging the validity of the Rule, but make the further defense that the payment of

$15,418.96 plus interest made by Eaton to Norwich, and accepted by it, was a good faith settlement of defendant's liability for the short-swing transaction; and moreover that the defendant cannot be held for additional "profit," for he had in good faith relied upon the Commission rule. In practical terms what is involved is whether the market increment of the stock from the time Eaton acquired his option up to the short-swing period surrounding the sales herein is to be included in computing the profits of the short-swing transactions.

■ The essential purpose of section 16(b) as appears from its policy declaration and as repeatedly emphasized by the courts is to assure a fair and honest market and to prevent short-swing speculation and market manipulation by directors, officers and ten per cent stockholders through the use of inside or advance information.[5] To effectuate that purpose, Congress provided that "any profit realized" by an insider on any purchase and sale, or any sale and purchase, of an equity security within any period of less than six months, the so-called swing period, was to inure to the benefit of the corporation. The Act itself does not specify how the "profit realized" is to be computed. The Courts, in the absence of such legislative direction, have fashioned their own rules largely on an ad hoc basis. In enforcing the Act, they have gone upon the assumption that it intended "to squeeze all possible profits out of stock transactions"[6] as the effective means of discouraging short-swing transactions. Thus, in the early and oft cited case of Smolowe v. Delendo Corp.[7] our Court of Appeals, in considering the method for computing "any profit realized," rejected such concepts as "identity of certificates," "first in, first out" and "average cost of shares," as permit-

5. Adler v. Klawans, 267 F.2d 840, 844 (2d Cir. 1959); Park & Tilford, Inc. v. Schulte, 160 F.2d 984, 987 (2d Cir.), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947); Smolowe v. Delendo Corp., 136 F.2d 231, 235–236, 148 A.L.R. 300 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

6. Smolowe v. Delendo Corp., 136 F.2d 231, 239 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

7. 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

ting possible evasion of the purposes of the Act. It reached an empirical judgment that "The only rule whereby all possible profits can be surely recovered is that of lowest price in, highest price out —within six months * * *." [8] This doctrine was independently examined and adhered to in Gratz v. Claughton [9] with the observation by Judge Learned Hand that the proper method for determining "any profit realized" was "in such a way as to increase them to the greatest possible amount"—in short, that maximization of profits was the yardstick of recovery. This concept, now too firmly entrenched to be questioned in any respect, presents no problem in its application to transactions involving securities which had their origin wholly within the short-swing period.

The plaintiffs urge that the same underlying rationale of "squeezing all possible profits" applies in computing profits upon the stock acquired by the defendant through the exercise of his four-year old option, constituting one of the items within the short-swing period. Essentially, what is involved is the determination of the cost basis of the stock in order to determine the profits realized. The plaintiffs, relying upon Steinberg v. Sharpe,[10] urge that the cost basis is the option price plus the value of the option on the date it accrued, that is, when the defendant had the right to exercise it—in short, the market value of the underlying stock on the accrual date. In the instant case, this would be the date the option was granted, August 25, 1956, when the market price was $13.63. Under this method of computation the de-

fendant Eaton would be required to turn over to the corporation the entire market appreciation of the stock from the time he acquired the option, a period of almost four years.

Steinberg does not control the instant situation. First, since the accrual date, the exercise date of the option and the date of sale in that case were all within a six-month period, no long term gain was at issue or included in the recovery. Second, Rule X–16B–6 expressly provides that it is inapplicable if it enlarges the recoverable profits, and under the facts of Steinberg, the Rule was inapplicable.

However, shortly after the promulgation of the Rule, its validity was squarely upheld in Blau v. Hodgkinson [11] and indeed applied retroactively. There the sale took place within six months of the date of the exercise of the option and more than five years had elapsed between the accrual date and the exercise date. Notwithstanding Blau v. Hodgkinson, the plaintiffs urge that the Rule be declared invalid. They rely heavily upon a statement in Rattner v. Lehman [12] that "[t]he Commission may exempt 'transactions'; but it cannot reduce the liability imposed by section 16(b)." Admittedly, the statement was dictum and, as we shall presently indicate, was concerned with other problems.

The plaintiffs further press their attack by reference to decisions with respect to another Rule, X–16B–3, which entirely exempted stock purchases by insiders pursuant to certain restricted option plans from the operation of section 16(b).[13] In Greene v. Dietz,[14] our

8. Id. 136 F.2d at 239.

9. 187 F.2d 46, 51 (2d Cir.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951).

10. 95 F.Supp. 32 (S.D.N.Y.1950), aff'd on opinion below, 190 F.2d 82 (2d Cir. 1951). See Berkey & Gay Furniture Co. v. Wigmore, 5 S.E.C.Jud.Dec. 442 (S.D. N.Y.1947). See also, Truncale v. Blumberg, 88 F.Supp. 677 (S.D.N.Y.), aff'd sub nom. on opinion below, Truncale v. Scully, 182 F.2d 1021 (2d Cir. 1950).

11. 100 F.Supp. 361 (S.D.N.Y.1951).

12. 193 F.2d 564, 566 (2d Cir. 1952).

13. The version of the Rule involved is set forth in Greene v. Dietz, 247 F.2d 689, 691 n. 3 (2d Cir. 1957). The Rule has since been amended to exclude from its exemptive provisions the acquisition of "stock acquired upon the exercise of an option, warrant or right." 17 C.F.R. § 240.16b–3 (1963 Cum.Supp.). See 24 Fed.Reg. 9272 (1959) ; S.E.C. Release No. 6111 (Nov. 5, 1959).

14. 247 F.2d 689 (2d Cir. 1957).

Court of Appeals in dictum cast doubt upon the validity of Rule X–16B–3, and subsequently Judge Ryan, in Perlman v. Timberlake,[15] held it was invalid.[16] Accordingly, the plaintiffs say that since under these decisions the Commission was without power to exempt from the operation of section 16(b) a purchase of stock acquired by the exercise of an option, it necessarily follows that the Commission had no authority to reduce recoverable profits as Rule X–16B–6 contemplates. These cases do not control the present situation. They concerned a different rule which sought to exempt *entirely* a purchase of option stock from the operative effect of section 16(b). It exempted both the long-term gain and the short-swing profit. Moreover, the Greene v. Dietz dictum drew a sharp dissent. These cases alone do not justify disregarding Blau v. Hodgkinson or concluding that its holding has been overruled. If it is not to be followed, more persuasive arguments must be presented.

The plaintiffs' basic position is that the use of options by insiders to manipulate the market in short-swing trading in large measure led to the enactment of section 16(b), and that only by literal and rigid interpretation of its provisions can its purpose to prevent recurrence of the evils be enforced. They emphasize that the reference therein to the recapture of "any profit realized" for the benefit of the corporation can only mean all profits derived from short-swing transactions, whether realized by reason of long-term investment or short-swing speculative activities. Accordingly, they urge that the Rule which excludes a portion of "any profit realized" is inconsistent with and frustrates the Congressional purpose, and hence is beyond the rule-making competence of the Commission. Further, they stress that the Act authorizes the Commission to exempt only transactions " * * * as not comprehended within the purpose of [16 (b)]." They argue that once "a purchase and sale" or "a sale and purchase" is within the ambit of section 16(b), liability automatically attaches and perforce the Commission is without power to reduce the recovery of "any profit realized." However, to state the plaintiffs' position begins rather than ends inquiry, since "any profit realized" may have varied meanings,[17] depending upon the method used to compute the profits in order to carry out the statutory intent—and, as we have noted, Congress itself has provided no specific guidelines.

Before considering the Commission's position, it is desirable to note that section 16(b) was not intended to discourage long-term investments or transactions by insiders. The short-swing period, a six-month limitation, was referred to by its chief proponent as a "crude rule of thumb."[18] That period was declared "off limits" for insiders. At best it reflected a realistic judgment as to how to achieve the objectives of the law to discourage short-swing trading by depriving insiders of their profit on the transactions. Thus, it eliminated the difficult problem of proof if intention to "get out on a short-swing" or if actual use of inside information was to be the standard upon which liability rested.[19]

---

15. 172 F.Supp. 246 (S.D.N.Y.1959).

16. Contra, e.g., Continental Oil Co. v. Perlitz, 176 F.Supp. 219 (S.D.Tex.1959). See authorities cited in Loss, Securities Regulation 1117 n. 309 (2d ed. 1961).

17. Cf. International Stevedoring Co. v. Haverty, 272 U.S. 50, 52, 47 S.Ct. 19, 71 L. Ed. 157 (1926); Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399, 404 (2d Cir. 1957); Kraft Foods Co. v. Commissioner of Internal Revenue, 232 F.2d 118, 123 (2d Cir. 1956).

18. 15 Stock Exchange Practices, Hearings before Sen. Comm. on Banking and Currency, 73d Cong., 2d Sess. (1934) 6557. See Hardee, Stock Options and the "Insider Trading" Provisions of the Securities Exchange Act, 65 Harv.L.Rev. 997, 1007 (1952).

19. See Smolowe v. Delendo Corp., 136 F. 2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943); Hearings, op. cit. supra note 18 at 6557.

The Commission, in its official release which accompanied the Rule, noted its awareness of the controversy over the proper method of computing profits under section 16(b) involving an equity security acquired pursuant to an option which had elements of both long-term gain and short-swing profit.[20] It recognized, depending upon the method used, that the profit attributable to a market rise in the value of the equity stock during the time the option was unexercised could be included or excluded. The use of the accrual date for the purpose of measuring profits, as in Steinberg, would mean in most instances that any long-term increment in the stock upon the exercise of the option would inure to the benefit of the corporation since the accrual date generally coincided with or was close to the date of grant of the option. Typical is the instant case, where the increase in the value of the stock over the four-year period before the exercise of the option was substantial. On the other hand, the use of market value on the exercise date of the option would not prevent the insider from reaping profits in the short-swing period. For example, if an insider, based on inside information, anticipating an increase in the stock, waits until the increase has occurred and acquires the stock by exercising his option, and immediately or shortly thereafter sells in the peak market, in most cases, if the market value on the exercise date were used as the cost basis, there would be no or very little profit recoverable.[21]

The Commission considered these and other alternative methods of computing "any profit realized" as inadequate in meeting the problem of recapturing "all possible profits" resulting from short-swing operations while at the same time avoiding the harsh result that would follow by including in the recovery the long-term gain in the stock, which was entirely unrelated to any short-swing activity. To accommodate these conflicting interests, it fashioned its own Rule. The Rule grants partial exemption with respect to profits which might otherwise be deemed to have been recoverable, where there is a purchase by an "insider" of an equity security pursuant to the exercise of an option or similar right and a sale within six months thereof. It limits the recoverable profit to the difference between the sale price and the lowest market price within six months before or after the sale. It applies only if the option were acquired more than six months before its exercise, or pursuant to an employment contract entered into more than six months before its exercise. The Rule does not exempt the short-swing aspect of the transaction from liability. It compels the insider to disgorge the short-swing profits to the corporation, but permits him to retain the portion attributable to the long-term increase in the value of the security. The Commission was of the view that to deprive an optionee of the long-term investment benefits where the evils against which section 16(b) were directed do not come into play presented an inequitable situation which warranted relief. The Commission considered that this harsh result was emphasized by the fact that an insider could have exercised his option, acquired the stock and sold it after six months without subjecting himself to liability under section 16(b).[22]

The Commission, in its release, after reviewing the evils which gave rise to section 16(b) and its purposes, stated:[23]

"The legislative history makes clear a basic purpose to deter manipulative activity and abuse of inside information by insiders. This

---

20. S.E.C. Release No. 4509 (Oct. 30, 1950). See S.E.C. Release No. 4145 (Aug. 6, 1948); S.E.C. Release No. 4045 (Feb. 6, 1948).

21. Steinberg v. Sharpe, 95 F.Supp. 32, 33–34 (S.D.N.Y.1950), aff'd on opinion below, 190 F.2d 82 (2d Cir. 1951).

22. S.E.C. Release No. 4509, 4–6 (Oct. 30, 1950).

23. Id. at 3–6.

purpose must of course be related to the discrimination section 16(b) makes between long term investment and short-swing speculation. * * * Congress evidently did not intend to discourage those who manage and control a company from having an investment stake in it. * * *

* * * * * *

"[W]e have seen that Congress did not intend to impose a drastic sanction in the event of such a sale, but merely to remove the profit incentive to entering into short-swing transactions. We believe it inconsistent with this purpose to include in the profits which the insider must surrender not only any profits attributable to the short-swing, but profits which represent the long term increment in value attributable to the possession of a right to acquire stock. To avoid this consequence and still discourage the use of the option as a means of realizing unfairly upon inside information or upon short term market swings, which the insider might be tempted to influence, we believe it is necessary to arrive at a method of computing profits which will discriminate between the long term and short term aspects of profits realized in such purchases and sales. While it is conceivable that such a discrimination might be arrived at as a matter of judicial interpretation of the phrase 'profit realized by,' it is by no means certain that this would result, since the Congress evidently intended to give a relatively sweeping scope to Section 16(b) leaving it to the Commission, in the exercise of its powers of exemption, to re-

lieve against hardships outside the statutory purpose."

▪ This Court holds, with great deference to the dictum in Rattner v. Lehman, that the Rule, based upon the foregoing and other considerations stated by the Commission, was within its competence under section 16(b) to exempt "any transaction or transactions * * not comprehended within the purpose of this subsection." Restricted stock options of the type here under consideration have their genesis in express approval by the stockholders of the corporation and are intended to enable its employees to benefit from an increase in the market value of the security. The corporate purpose is satisfied through the optionee's services and his efforts to further its interests. Indeed it is in the corporate economic interest that its employees have an investment stake in it. Congress itself has recognized the salutary purpose of such plans by extending them favorable tax treatment.[24] To take away from the employee that which the corporation intended he should have would defeat the very purpose of the stock option plan without serving the purpose of section 16(b). As has been observed: "§ 16(b) does not strip the insider of all advantage. He may increase or decrease his holdings according to the dictates of his special knowledge. It is only the short-swing transaction which must yield profits to the company alone." [25]

The answer to the plaintiffs' position, bottomed upon the dictum of Rattner v. Lehman that "[t]he Commission may exempt the 'transactions'; but it cannot reduce the liability imposed by section 16(b)," is that that case did not involve Rule X–16B–6, but concerned partners' liability under section 16(b); further, it did not involve stock options.[26]

24. Int.Rev.Code of 1954, § 421. See Senate Committee on Finance, Report on Revenue Act of 1950, S.Rep.No.2375, 81st Cong., 2d Sess. (1950), reprinted in U.S.Code Cong.Serv. pp. 3053, 3114 (1950).

25. Roberts v. Eaton, 212 F.2d 82, 85 (2d Cir.), cert. denied, 348 U.S. 827, 75 S. Ct. 44, 99 L.Ed. 652 (1954).

26. With respect to the Rule involved in Rattner v. Lehman, Rule X–16A–3(b), 17 C.F.R. § 240.16a–3(b) (1949 ed.), Judge Clark subsequently stated: "The

There is no evidence that Congress intended to force upon the Commission an "all or nothing" choice [27]—that is, either to exempt the whole transaction and thus give insiders absolution from liability arising from the very type of abuse which Congress condemned, or to deprive insiders who had acquired long-term options of the increment during the years prior to the exercise of the option and beyond the scope of the short-swing period. The Rule, since it requires forfeiture to the corporation of any profits within the short-swing period, is consistent with the statute; and the exemption of the long-term increment outside the short-swing period does not negate but rather conforms to its purpose. As the Commission points out, the type of transaction here at issue involves two elements, one of which is within and the other outside the ambit of the statute. The Rule appears to strike a fair balance, on the one hand enforcing the deterrent purpose of the Act by requiring an insider to surrender all possible short-swing profits, and on the other, permitting him to retain the benefits of his long-term gains. The authority to "exempt any transaction * * * not comprehended within the purpose of" section 16(b) necessarily includes as an incident thereof the power to grant less than full exemption so long as the section's essential purpose is realized. There is no requirement in law or reason that the full

panoply of power be expended where, to avoid a harsh result, the use of less power will still achieve the objectives of the Act.

No claim can be made that the Rule method for determining profits to inure to the corporation during the short-swing period reduces recovery so as to make it illusory, contrary to the terms of section 16(b). The sweep of the Rule for a full six months before and a full six months after the sale by an insider appears to squeeze out even more profit than in the instance of a typical short-swing transaction by the application of the rule in Smolowe v. Delendo Corp.[28]

In addition to section 16(b), authority for the Rule is found in section 3(a)(12) of the Act,[29] a provision not referred to in the Rattner v. Lehman dictum. In promulgating the Rule, the Commission also relied upon its rule-making powers under this section.[30] The section provides in relevant part that the Commission may exempt securities

"by such rules and regulations as it deems necessary or appropriate in the public interest or for the protection of investors, either unconditionally or upon specified terms and conditions or for stated periods * * * from the operation of any one or more provisions of this chapter which by their terms do not apply to an 'exempted security' * * *."

---

matter of the validity of such a Commission regulation is obviously still an open one." Blau v. Lehman, 286 F.2d 786, 796 (2d Cir. 1960) (dissenting opinion), aff'd, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed. 2d 403 (1962).

27. One noted commentator has observed that the view that "the Commission's power to exempt 'transactions * * * as not comprehended within the purpose of' § 16(b) must be exercised on an all-or-nothing basis seems to be a rather grudging construction of a provision which was obviously designed to temper a section described as a 'crude rule of thumb.'" Loss, Securities Regulation 1103 (2d ed. 1961).

See Cook and Feldman, Insider Trading Under the Securities Exchange Act, 66

Harv.L.Rev. 612, 634 (1953). Contra, Hardee, Stock Options and the Insider Trading Provisions of the Securities Exchange Act, 65 Harv.L.Rev. 997, 1006 (1952).

28. 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

It should be noted that no issue is raised here which calls upon the Court to determine whether a judicially fashioned standard of liability would result in a lesser recovery than that permitted under the Rule, and nothing said herein is intended to reflect any judgment on that question.

29. 15 U.S.C. 78c(a) (12) (1958).

30. 15 Fed.Reg. 7357 (1950); 19 Fed.Reg. 1174 (1954).

Section 16(b) by its terms does not apply to an "exempted security." The plaintiffs contend that section 3(a) (12) is not a source of authority for the Rule since the power granted thereunder to the Commission is to exempt "securities" and not "transactions" as in the instance of 16 (b); the latter section, they emphasize, unlike section 3(a) (12), contains no reference to exemption "upon specified terms and conditions." This contention, which as a matter of technical construction, on the one hand denies that the authority under section 16(b) to exempt "transactions" includes the power to impose conditions, and on the other hand also denies that the authority under section 3(a) (12) to "exempt securities * * * upon terms and conditions" extends to "transactions," would hobble the Commission's function. This restricted view would deny to the Commission the very broad powers Congress intended to confer upon it in dealing with the host of unforeseeable problems which might arise in the administration of the Act. Congress, in an effort to avoid a "straight jacket" administration, vested the Commission "with power to eliminate undue hardship and to prevent and punish evasion." [31] In any event, the authority granted to the Commission under sections 3(a) (12) and 16(b), taken together, gave it the necessary power to promulgate the Rule if it believed that the long term investment of the insider required protection against a harsh result.[32]

Since the Court upholds the validity of the Rule, there is no occasion to pass upon the defendant's defense under section 23(a) [33] of good faith reliance upon Rule X–16B–6 or the defense of a good faith settlement of Eaton's liability, particularly so since, in the event of review, a question of law is involved and no fact upon which the good faith issue rests is presented which requires determination at the District Court level.

The defendant's cross-motion for summary judgment is granted and the plaintiffs' motion is denied.

---

31. S.Rep.No.792, 73d Cong., 2d Sess., 5 (1934).

32. Professor Loss is of the view, "[A]lthough the Commission is not specifically authorized to exempt 'transactions' as distinct from 'securities,' the exigencies of administration have led to certain transaction exemptions, and there is no reason to suppose that this view of the Commission's power is inconsistent with the legislative intention." Securities Regulation 799–800 & n. 49 (2d ed. 1961).

